IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| INT'L FRESH PRODUCE ASS'N, *ET AL.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-00309 |
| UNITED STATES DEPARTMENT OF LABOR, *ET AL.*, | |
| Defendants. | |

**BRIEF OF THE AFL-CIO AS *AMICUS CURIAE*
IN SUPPORT OF DEFENDANTS' OPPOSTION TO PLAINTIFFS'
MOTION FOR A STAY AND A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTEREST OF THE AMICUS CURIAE AFL-CIO................................................1

INTRODUCTION.................................................................................................1

ARGUMENT.......................................................................................................4

I.   The NLRA Does Not "Preclude" the Rule.....................................................4

    A.   The NLRA excludes agricultural employees and thus in no way
        prevents either states *or* the federal executive branch from
        regulating in this area..............................................................................5

    B.   The rule does not create rights in any way comparable to those
        vested in covered employees by the NLRA, but rather
        is tailored to accomplish DOL' statutorily-mandated duties
        under the immigration law ...................................................................10

    C.   Past practice demonstrates that the executive can protect
        employees excluded from the protections of the NLRA......................16

II.   The Rule Does Not Limit Employers' First Amendment Right....................18

    A.   The Rule regulates conduct not speech..............................................18

    B.   The Rule permissibly protects unwilling listeners.............................22

    C.   The Rule is not vague.........................................................................24

III.   The Rule's Protections of Concerted Activities Are Severable....................28

CONCLUSION..................................................................................................30

## INTEREST OF AMICUS CURIAE

The AFL-CIO is a federation of 60 national and international labor organizations with a total membership of over 12.5 million working men and women.[1] For almost 90 years since the passage of the National Labor Relations Act ("NLRA") of 1935, the AFL-CIO and AFL-CIO-affiliated unions have litigated cases under the NLRA before the National Labor Relations Board ("NLRB"), the lower federal courts, and the Supreme Court. Given the AFL-CIO's history and vast experience with the NLRA, the AFL-CIO files this brief as amicus curiae centrally to explain why the NLRA in no way precludes the Department of Labor's effort to protect U.S. workers by adopting the rule at issue in this case, Dep't of Labor, "Improving Protections for Workers in Temporary Agricultural Employment in the United States," 89 Fed. Reg. 33,898 (Apr. 29, 2024) (hereinafter, the "Rule").

## INTRODUCTION

Prior to issuing a labor certification that is required for the approval of an employer's petition to employer an H-2A worker, DOL is statutorily mandated to conclude that "the employment of the alien . . . will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(B). In furtherance of this statutory command, DOL has long

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except *amicus* contributed money to fund the preparation or submission of this brief.

required employers to provide assurances that they will comply with a set of substantive requirements, including paying a minimum rate of pay called the Adverse Effect Wage Rate ("AEWR"); providing housing, meals, inbound and outbound transportation; and abiding by other minimum standards. *See* 20 C.F.R. § 655.122. None of these requirements—which have existed since the very beginnings of the H-2A program—are challenged here.

After notice and review of extensive comments, however, the DOL found that non-compliance with these assurances is rampant. Even though the Department has the capacity to inspect less than one percent of agricultural employers per year, 88% of DOL investigations covering the H-2A program have found program violations over the past five fiscal years. 89 Fed. Reg. at 33,988. And DOL put forth a compelling explanation for this state of affairs—a number of factors, including "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer," combine to create a vulnerable sub-population of workers who are "less able and less likely to advocate on behalf of themselves or their co-workers to seek compliance with the terms and conditions of employment set forth in the Department's regulations." *Id.* at 33,987. The result? A situation where American agricultural employment has flatlined over the last three decades, while use of the H-2A program has increased sevenfold in part due to noncompliance with mandated minimum conditions. *Id.* at 33,990 n.76.

DOL can only fulfill its statutory mission of avoiding an adverse effect on American workers if employers, in fact, make good on their assurances and provide

the minimum benefits to which they commit. This requires robust anti-retaliation protections for H-2A workers. DOL's Rule properly recognizes that the existing protections against retaliation have been insufficient to plug the enforcement gap and thus eliminate the adverse effect on U.S. workers. It also proposes a reasonable solution: because Government-led enforcement has proven demonstrably insufficient to enforce the H-2A program's mandates, permit workers to "speak up on their own behalf to enforce these terms and conditions of employment" by protecting them from retaliation for engaging in "concerted activities for the purpose of mutual aid or protection relating to wages or working conditions." *See* 89 Fed. Reg. at 33,990; 20 C.F.R. § 655.135(h)(2)(i). Thus understood, the Rule is a whistleblower provision that expands on anti-retaliation protections that have been a feature of the H-2A program since its inception in 1987.

The only court that has considered an analogous challenge to the Rule concluded that the Rule fits squarely within DOL's statutory mandate to ensure that the employment of H-2A workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(B); *see Kansas v. DOL*, No. 2:24-cv-76, 2024 WL 3938839, at *6 (S.D. Ga. Aug. 26, 2024) (holding that "Final Rule falls within the DOL's rulemaking authority" which "affords the [agency] considerable latitude").

Rather than bolster that sound conclusion, we focus principally on rebutting Plaintiffs' contentions that the NLRA somehow preempts the Rule. Secondarily, we address Plaintiffs' claim that the Rule's prohibition on disciplining workers for

declining to attend certain employer-sponsored meetings or listen to employer-sponsored speech violates employers' First Amendment rights.

## ARGUMENT

### I.     The NLRA Does Not "Preclude" the Rule

Plaintiffs argue that the NLRA somehow bars the DOL from adopting the Rule. That is incorrect for three reasons: (1) the NLRA in no way regulates agricultural employment and does not prevent either states or the federal executive branch from regulating in this area, (2) the Rule does not create rights in any way comparable to those vested in covered employees by the NLRA, and (3) there is a bipartisan consensus and substantial past practice supporting the executive branch's authority to extend protections to workers excluded from the protection of the NLRA.

Plaintiffs argue that when Congress has excluded a category of workers from the protections of the NLRA, such as agricultural workers, the NLRA "prevents 'all regulations, whether state or federal.'" ECF No. 18 ("Pl. Br.") at 12 (quoting *Building & Construction Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 226-27 (1993)). But that is obviously wrong for at least three reasons. First, the Supreme Court has expressly rejected that conclusion as it relates to public employees who are excluded from the NLRA just like agricultural workers. *See* 29 U.S.C. § 152(2) ("the term 'employer' . . . shall not include the United States") *and Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 181 (2007) ("The National Labor Relations Act leaves States free to regulate their labor relationships with their

4

public employees.") Second, every lower federal court that has addressed the issue, except the Southern District of Georgia in the preliminary ruling cited by Plaintiffs, has rejected that conclusion. *See infra* section I(A). Third, accepting that conclusion would require the invalidation of scores of state laws that have for decades extended full collective bargaining rights to various categories of workers excluded from the NLRA. In the area of agriculture alone, such laws are on the books in at least ten states.[2] Accepting Plaintiffs' argument would level even more state laws granting parallel rights to public employees who are similarly excluded from the NLRA. *See Janus v. American Fed. of State, County, and Mun. Employees, Council 31*, 585 U.S. 878, 961 (Kagan, J., dissenting) (22 states and the District of Columbia have laws granting public employees a right to collectively bargain).

We now proceed to demonstrate in detail why Plaintiffs are wrong about the NLRA.

**A. The NLRA excludes agricultural employees and thus in no way prevents either states *or* the federal executive branch from regulating in this area**

The NLRA expressly exempts from its coverage all of the workers covered by the Rule. The NLRA provides that the employees granted rights under the Act "shall not include any individual employed as an agricultural laborer." 29 U.S.C.

---

[2] *See* Ariz. Rev. Stat. § 23-1381 to 1395; Cal. Lab. Code § 1140 et. seq.; Colo. Rev. Stat. § 8-3-104(1); Kan. Stat. § 44-818 to 830; La. Stat. § 23:881 to 889; Mass. Gen. Laws ch. 150A, § 5A; Neb. Rev. Stat. Ann. § 48-901 to 911; N.Y. Lab. Law § 670; Or. Rev. Stat. § 662.805 to 662.825; and Wis. Stat. Ann. § 111.115(3).

§ 152(3).[3] That exclusion in no way suggests that Congress intended to prevent federal agencies other than the NLRB from protecting agricultural laborers in any ways similar to the NLRA when doing so is otherwise within the agency's authority under another federal statute.

That is made clear by the contrasting treatment of supervisors who are excluded in the very same section of the amended NLRA that excludes agricultural workers. *See* 29 U.S.C. § 152(3) (excluding from the definition of employee "any individual employed as a supervisor"). In relation to supervisors, but *not* in relation to agricultural laborers, Congress expressly precluded both state and federal action, requiring employers to treat supervisors as employees for purposes of any law even "relating" to collective bargaining. Congress provided, "no employer subject to this Act [subchapter] shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local,

---

[3] Because the NLRA excludes agricultural workers, Plaintiffs' citation to cases involving "a comprehensive statutory scheme addressing a particular subject matter" are inapposite. *See* Pl. Br. 11 (citing *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014) ("*POM*") and *Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999)).
   In any case, *POM* and *Lollar* concern the entirely different question about whether a plaintiff has a private right of action under a more general statute when a more specific statute creates a comprehensive regulatory scheme. *See POM,* 573 U.S. at 111 (addressing "whether a private party may bring a Lanham Act claim challenging a food label that is regulated by the FDCA"); *Lollar*, 196 F.3d at 607 (addressing "[w]hether section 1983 provides Lollar with a remedy against Baker for her alleged violations of the Rehabilitation Act"). Here, the Rule does not in any way create a private right of action.
   Moreover, the notion that this is a preclusion and not a preemption case is contradicted by Plaintiffs' own (correct) argument that this case is governed by the Supreme Court's *Machinist*s labor law preemption doctrine. *See* Pl. Br. 12–13.

relating to collective bargaining." 29 U.S.C. § 164(a). The absence of such express preemption of state *an*d federal action in respect to agricultural laborers clearly suggests that Congress intended no such preclusion in relation to agricultural workers. *See Chamber of Commerce v. Seattle*, 890 F.3d 769, 793–94 (9th Cir. 2018) (distinguishing independent contractors from supervisors for this reason).

Every court that has considered the agricultural exclusion as well as other, parallel exclusions—including government employees, domestic workers, and independent contractors—has reached the same conclusion: except as far as supervisors are concerned, the NLRA does <u>not</u> preclude state or executive branch action.   The Ninth and Seventh Circuits have determined that "federal policy is indifferent" to the regulation of agricultural workers, and therefore "states remain free to legislate as they see fit." *United Farm Workers v. Ariz. Agric. Emp. Rels. Bd.,* 669 F.2d 1249, 1257 (9th Cir. 1982) (internal quotation marks omitted). *See also Villegas v. Princeton Farms, Inc.,* 893 F.2d 919, 921 (7th Cir. 1990). The Ninth Circuit concluded, "We find nothing in the National Labor Relations Act to suggest that Congress intended to preempt such state action by legislating for the entire field. Indeed, we draw precisely the opposite inference from Congress's exclusion of agricultural employees from the Act." *United Farm Workers,* 669 F.2d at 1257. *See also Willmar Poultry Co. v. Jones*, 430 F. Supp. 573, 578 (D. Minn. 1977) ("The court has not been directed to, nor has it found, any explicit expression of a national labor policy that agricultural laborers be denied all representational rights. . . . [T]he exclusion of agricultural laborers from the NLRA's coverage standing alone cannot

be construed to mean that Congress intended the area to remain unregulated.") And the same conclusion has been reached concerning other excluded workers. *See Davenport*, 551 U.S. at 181 ("The National Labor Relations Act leaves States free to regulate their labor relationships with their public employees."); *Greene v. Dayton*, 806 F.3d 1146, 1149 (8th Cir. 2015) ("Although Congress exempted domestic service workers from the NLRA, Congress did not demonstrate an intent to shield these workers from all regulation.") As the Ninth Circuit explained with reference to independent contractors, "the fact that a group of workers is excluded from the definition of 'employee' in § 152(3), without more, does not compel a finding of . . . preemption." *Chamber of Commerce v. Seattle*, 890 F.3d at 793 (independent contractors).

The uniform conclusion of those cases cannot be dismissed on the grounds that they concerned state and not federal action. In this specific context, the Supreme Court and lower federal courts have made clear that state action and federal executive action are analyzed using the same preemption principles. That is because the form of federal labor law preemption that Plaintiffs argue applies here– so-called *Machinists* preemption, *see* Pl. Br. 12, applies *equally* to all state action as well as federal executive branch action.

In *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Commission, ("Machinists")*, 427 U.S. 132 (1976), the Supreme Court held that certain categories of regulation of labor relations are beyond the power of both the states *and* the federal executive branch because "Congress meant to leave some

8

activities unregulated." *Id*. at 144. And the Court further explained that regulation of labor relations is impermissible "when it . . . [is of] an activity that Congress intended to be 'unrestricted by Any governmental power to regulate.'" *Id*. at 141 (quoting *NLRB v. Insurance Agents*, 361 U.S. 477, 488–89 (1960) (capitalization in original). The Court made clear that even the NLRB, the federal agency with authority to enforce the NLRA, could not regulate in these areas. "Our decisions hold that Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB." *Id*. at 149. Thus, the Court made crystal clear that *Machinists* preemption principles apply to "regulation, whether federal or State." *Id*. at 153. And in a later case, the Court described *Machinists* pre-emption as creating a "free zone from which all regulation, 'whether *federal* or State,' is excluded." *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 111 (1989) (quoting *Machinists,* 427 U.S. at 153) (emphasis added).

For these reasons, courts that have considered whether federal executive action is barred by the NLRA have uniformly done so using the same *Machinists* preemption principles applied to state laws. For example, in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), the D.C. Circuit considered whether the NLRA precluded the President from issuing an executive order preventing federal contractors from permanently replacing strikers. The Court evaluated the issue using the same *Machinists* preemption principles applied to state laws. *See id*. at 72–78. Indeed, the Court stated emphatically, "Nor, as we have noted, is there any

9

doubt that *Machinists* 'pre-emption' applies to federal as well as state action." *Id.* at 73. Similarly, in *UAW-Labor and Employment Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003), the Court analyzed a federal executive order requiring federal contractors to post a notice of union-represented employees' right not to financially support union activities unrelated to collective bargaining, expressly and exclusively using the same *Machinists* preemption principles applied to state laws. *See id.* at 362–66. No court has analyzed federal executive actions using other principles and no court has found that federal executive action is precluded by the NLRA when parallel state action would be permitted.

And, conversely, courts that have considered state laws regulating agricultural labor relations have understood that "[t]he crucial question is whether or not national labor policy requires that labor relations activity involving agricultural laborers be free from all regulation, state *as well as federal." Willmar*, 430 F. Supp. at 577 (emphasis added).

The uniform holdings that the NLRA does not bar state regulation of employees excluded from the coverage of the NLRA (other than supervisors) apply directly here.

**B. The rule does not create rights in any way comparable to those vested in covered employees by the NLRA, but rather is tailored to accomplish DOL' statutorily-mandated duties under immigration law**

Plaintiffs assert that "the Rule largely mimics the substantive provisions of the [NLRA]." Pl. Br. 1. That is simply incorrect.

We begin with the NLRA's statutory purpose. Congress recognized that, among other factors, "the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest," which in turn "have the . . . necessary effect of burdening or obstructing commerce." 29 U.S.C. § 151. Congress then made a finding that "protection by law of the right of employees to organize and bargain collectively . . . promotes the flow of commerce by encouraging practices fundamental to the friendly adjustment of industrial disputes," *id.* —*i.e.,* resolving economic conflicts by means of negotiation rather than force. Accordingly, Congress declared it "to be the policy of the United States to eliminate the causes of . . . obstructions to the free flow of commerce . . . by encouraging the practice and procedure of collective bargaining, and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment . . . ." *Id.*

As the preamble makes plain, "[t]he NLRA is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers." *NLRB v. Am. Nat. Ins. Co.*, 343 U.S. 395, 401–02 (1952). To achieve this goal, the NLRA relies on three central prongs. First, the Act provides for an election procedure to resolve questions of union representation by potentially certifying a union as an exclusive representative for the purposes of collective bargaining. 29 U.S.C. § 159. Second, once a union has been certified, the statute grants employees a right to engage in collective bargaining and imposes a

duty to bargain on employers. *See* 29 U.S.C. §§ 158(a)(5); 158(d). And, thirdly, to make this right to bargain effective, it protects employees' ability to "form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," *id.* § 157, and proscribes employer interference with such activity, *id.* §§ 158(a)(1), (a)(3).

Compare that with the requirements placed upon employers by DOL's Rule. The preamble states emphatically, "[t]his final rule does not provide for collective bargaining rights," 89 Fed. Reg. at 33,991, and no right *or* duty to bargain collectively can be found in the regulations. Neither can any right to request an election nor any election procedure. Simply put, both before and after the Rule, a H-2A employer presented with a bargaining demand by a labor union can lawfully refuse to bargain with—or even meet—the employees' chosen representative without violating the assurances required by 20 C.F.R. § 655.135. *See* 89 Fed. Reg. at 33,994 ("[T]he [Rule] does not require collective bargaining, employer recognition, or *any other action* by the employer in response to worker organizing." (emphasis added)).

These disparate requirements can be explained by the fact the NLRA and the Rule are justified by differing—even contrasting—goals. The NLRA is concerned with guaranteeing the *process* of collective bargaining, not substantive outcomes. The law "does not compel any agreement whatsoever between employees and employers" and "does [not] regulate the substantive terms governing wages, hours,

and working conditions which are incorporated in an agreement." *Am Nat. Ins. Co.*, 343 U.S. at 402. So long as employer and unions bargain in good faith, "Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." *Insurance Agents*, 361 U.S. at 488; *see also H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970) (NLRA provides for "private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract").

In contrast, the Rule is laser-focused on achieving a specific *substantive* outcome—employers' compliance with the minimum standards necessary to not undercut U.S. workers. *See* 20 C.F.R. § 655.122. The Rule *precisely* "regulate[s]"— indeed, unilaterally establishes—"the substantive terms governing wages, hours, and working conditions." In this context, requiring employers to refrain from discriminating against workers for engaging in protected concerted activities is aimed at "ensuring that workers have the tools to ensure that their rights under the H-2A program"—which are to be treated in accord with the minimum standards necessary to avoid adverse impacts on U.S. workers—"are not violated." 89 Fed. Reg. at 33,992.

Without the core NLRA requirement that the employer bargain collectively with a recognized labor organization, this is nothing more than an expansion of the anti-retaliation provisions that have been part of the H-2A program since its inception in 1987. *See* "Labor Certification Process for the Temporary Employment

of Aliens in Agriculture and Logging in the United States," 52 Fed. Reg. 20,496, 20,517 (June 1, 1987). Nothing in the NLRA's exclusion of agricultural employees from its collective bargaining regime precludes DOL from extending its existing protection to workers engaging in more informal advocacy, such as "two or more workers presenting joint requests or grievances to their employer," or "one worker speaking up for another, or two workers approaching their employer jointly." 89 Fed. Reg. at 33,992. And, in the H-2A context, protection of worker-directed-advocacy is particularly important because the geographic isolation of these workers means that they cannot depend on Government enforcement and are frequently left to their own devices to enforce the program's minimum standards. *See id.* at 34,004 ("[M]any farmworkers report never having seen a DOL or State labor or safety inspector during their time working in agriculture.").

Indeed, the earliest anti-retaliation protections—also promulgated by means of DOL regulations—borrowed just as heavily from other statutes. From 1987 on, employers have been required to assure DOL that they will not "intimidate, restrain, coerce, blacklist, discharge, or in any manner discriminate against" any person who has "filed a complaint," "instituted or caused to be instituted any proceeding," "testified or is about to testify in any proceeding," or "exercised or asserted on behalf of himself/herself or others any right or protection" under the H-2A statute or regulations, or who has "consulted with an employee of a legal assistance program or an attorney" on related matters. 29 C.F.R. § 655.103(g) (1987). This definition of prohibited retaliation is itself borrowed *verbatim* from

14

other statutes, including the Occupational Safety and Health Act ("OSH Act") and the Fair Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 660(c)(1) (OSH Act prohibits discrimination against any employee who has "filed any complaint," "instituted or caused to be instituted any proceeding," or "has testified or is about to testify in any such proceeding," or "because of the exercise by such employee on behalf of himself or others of any right" afforded by the Act); 29 U.S.C. § 215(a)(3) (FLSA prohibits discrimination against any employee who has "filed a complaint," "instituted or caused to be instituted any proceeding," or "has testified or is about to testify in any such proceeding").[4] DOL's decision to borrow the definition of the activities to be protected from retaliation from other statutes did not imply that it was "extending" the OSH Act or FLSA, in whole or in part, to H-2A workers.

The same holds true here. No principle of law prevents DOL from borrowing a limited number of concepts from NLRA jurisprudence in order to advance an entirely different statutory purpose unrelated to collective bargaining. On the contrary, employing time-tested legal concepts that have been demonstrated to be effective in other contexts is simply sound public administration.

---

[4] These anti-retaliation protections have continuously been an integral part of the H-2A program's administration, and have never been challenged. Prior to the promulgation of the Rule, they were codified in virtually identical form at 20 C.F.R. § 655.135(h) (2022). The Rule retains these protections and supplements them by requiring assurances that employers will not discriminate against employees who have "consulted with a key service provider" or participated in the enforcement of "applicable Federal, State or local laws or regulations" beyond the H-2A program. 20 C.F.R. § 655.135(h)(1)(v), (vii). Plaintiffs raise no argument relating to these sections of the Rule here.

### C. Past practice demonstrates that the executive can protect employees excluded from the protections of the NLRA

If Plaintiffs were correct that "[t]he NLRA prevents 'all regulations, whether state or federal,'" of excluded employees, Pl. Br. 12, the federal executive branch could not take any action in any way protecting collective action by workers excluded from the NLRA. That would be true, for example, of government workers no less than agricultural workers, as there is nothing in Plaintiffs' argument that is limited to the agricultural exclusion. But such a conclusion is contrary to long-settled, bipartisan practice in the federal sector embraced by three presidents.

Specifically, in 1962, President Kennedy issued Executive Order 10988, Employee-Management Cooperation in the Federal Sector (Jan. 17, 1962), granting federal employees a right to engage in collective bargaining through representatives of their choosing despite the fact that the NLRA expressly provides that "the term 'employer' . . . shall not include the United States." 29 U.S.C. § 152(2). Like the DOL here, President Kennedy took that action in order to further the broad terms of a separate and distinct statutory mandate "authoriz[ing] the President to issue regulations for the admission of persons into the civil service of the United States and for the governance of their conduct thereafter." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 452 (D.C. Cir. 1965) (describing 5 U.S.C. § 631 which was cited as basis of the order). The Executive Order was extended by both Presidents Nixon and Ford in Executive Orders 11491 (Oct. 29, 1969) and 11838 (Feb. 6, 1975) and federal employees continued to have the protections of those executive branch actions until 1978 when Congress adopted the Civil Service

Reform Act codifying the protections. Pub. L. 95-454, Title VII, 92 Stat. 1111, 1191-1218 (Oct. 13, 1978), codified at 5 U.S.C. §§ 7105 *et seq*. While those three Presidents cited a different statutory basis for their actions protecting federal employees than DOL cites here as the basis for protecting agricultural workers, in both instances, the executive branch extended rights to engage in concerted activities to categories of employees who were excluded from the NLRA. In other words, for 16 years there was a bipartisan consensus that the executive branch can do precisely what Plaintiffs argue it cannot do (in fact, considerably more than what Plaintiffs argue the executive branch cannot do).

That bipartisan past practice is entitled to substantial weight in a separation of powers case. The Supreme Court has explained that "in separation-of-powers cases this Court has often 'put significant weight upon historical practice.'" *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quoting *NLRB v. Noel Canning,* 573 U.S. 513, 514 (2014)). *See also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("established practice is a consideration of great weight" in constitutional cases involving the relationship between the executive and legislature). When construing the Constitution's broadly phrased division of powers among the branches, judges "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached." *Noel Canning*, 573 U.S. at 526. Established practice is crucial "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id*. at 525.

President Kennedy's highly visible action of issuing an executive order extending to federal employees a form of right not granted by Congress in the NLRA, affirmed and extended by both Presidents Nixon and Ford, acquiesced in by Congress, and not challenged in the courts, is entitled to great weight in considering the executive branch's authority to protect other workers excluded from the protections of the NLRA, such as agricultural workers.

For these reasons, Congress clearly did not intend to preclude DOL from furthering its separate and distinct statutory mandate in regard to agricultural workers not covered by the NLRA by extending protection to those workers when they engage in specific forms of concerted activity aimed at securing the minimum standards necessary to not undercut U.S. workers.

## II.    **The Rule Does Not Limit Employers' First Amendment Rights**

Plaintiffs contend that the Rule's prohibition of disciplining workers for declining to attend certain employer-sponsored meetings or listen to employer-sponsored speech violates employers' First Amendment rights. Pl. Br. 14–20. They are wrong because the Rule restricts conduct, not speech, and, even if it restricted speech, it does so to protect the rights of unwilling listeners—as the Supreme Court has held is permissible.

### A.  **The Rule regulates conduct, not speech**

Plaintiffs correctly state that an employer has a "free speech right to communicate his view to his employees." Pl. Br. 14. But the Rule in no way restricts the exercise of that right. Under the Rule, employers can say whatever they want on

any topic to H-2A employees, individually or in a group. The Rule merely prevents employers from taking action to force their employees to listen or punish them for not listening. The Rule thus regulates conduct, not speech. Specifically, it requires that employers who seek to employ H-2A workers give an assurance that they have not and will not "intimidate," "threaten," "blacklist," "discharge," "discriminate against" or take other adverse action because any worker has (1) "refused to attend an employer-sponsored meeting" or (2) "refused to listen to employer-sponsored speech or view employer-sponsored communications," when the "primary purpose" of such meeting, speech, or communications is to "communicate the employer's opinion concerning any activity protected by [the Rule]." 20 C.F.R. § 655.135(h)(2)(ii).[5]

The Rule regulates employers' actions, not their speech; it applies only to what employers "*do* [and] not what they may or may not *say*." *Rumsfeld v. Forum for Academic & Institutional Rights., Inc.*, 547 U.S. 47, 60 (2006) ("*FAIR*") (emphasis in original). The Rule in no way regulates what employers may say at a meeting, only what they may do if an employee refuses to attend. "[Employers] remain free under the [Rule] to express whatever views they may have on" employees' concerted activity. *Id*. All that employers may not do, or threaten to do,

---

[5] Plaintiffs misstate the Rule when they assert that it "suppress[es] speech that opposes unionization" and "empower[s] DOL to tilt the playing field in favor of unions." Pl. Br. 15. An employer that fires an employee who refuses to listen to an "employer's opinion" that employees *should* join a union or join a particular union would violate the Rule no less than one who urged employees *not* to do so.

under the Rule is discharge or discriminate against an employee who refuses to attend a meeting.

The Supreme Court has clearly held that, while employer speech is constitutionally protected, the conduct prohibited by the Rule is not. The Supreme Court held that an "employer's free speech right to communicate his views to his employees is firmly established," but a "threat of reprisal or force or promise of benefit" is not protected and may be prohibited. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 618 (1969).

Plaintiffs do not argue that intimidating, threatening, restraining, coercing, blacklisting, or discharging employees is expressive conduct, nor could they. The Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive." *FAIR*, 547 U.S. at 66; *see also United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Firing an employee is not inherently expressive. Nor can Plaintiffs argue that such conduct is given expressive meaning by the speech at the meeting the conduct coerces employees to attend. "The fact that such explanatory speech is necessary is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *FAIR*, 547 U.S. at 66. S*ee, e.g., The Bail Project, Inc. v. Comm'r, Indiana Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023) (organization's posting of bail for indigent defendants not expressive of a message opposing cash bail system because "no reasonable observer could

decipher a message from the conduct itself without some explanatory speech");

*Arkansas Times LP v. Waldrip*, 37 F.4th 1386, 1392 (8th Cir. 2022) (en banc)

(economic boycott of Israel not expressive because decision to refrain from doing

business not intelligible without explanatory speech);

Indeed, "[i]f combining speech and conduct were enough to create expressive

conduct, a regulated party could always transform conduct into 'speech' simply by

talking about it. For instance, if an individual announces that he intends to express

his disapproval of the Internal Revenue Service by refusing to pay his income taxes,

we would have to . . . determine whether the Tax Code violates the First

Amendment." *FAIR*, 547 U.S. at 66. Or, more to the point here, an employer could

say, "I am firing you to express my disapproval of your talking with your coworkers

about substandard wages or my disapproval of women in the workplace." But the

Supreme Court has rejected such arguments as accepting them would cause much

of modern anti-discrimination law to fall. *Id*.

Accepting the Plaintiffs' argument would have far-reaching and unacceptable

consequences. For example, it would give employers a constitutional right to fire

employees who decline to attend a meeting where the employer urges them to join

his religion or engages in prayer, effectively striking down Title VII of the Civil

Rights Act of 1964 as construed by the EEOC. *See* U.S. EEOC, Questions and

Answers: Religious Discrimination in the Workplace, EEOC-NVTA-2008-2 (July 2,

2008), https://www.eeoc.gov/laws/guidance/questions-and-answers-religious-

discrimination-workplace ("Some private employers choose to express their own

religious beliefs or practices in the workplace, and they are entitled to do so. However, if an employer holds religious services or programs or includes prayer in business meetings, Title VII requires that the employer accommodate an employee who asks to be excused for religious reasons.")[6] The unacceptable consequences of Plaintiffs' argument demonstrate that it is wrong.

### B. The Rule permissibly protects unwilling listeners

Even if the Rule did in some way restrict speech, the Supreme Court has held that is permissible in order to protect unwilling listeners.

The Rule is carefully tailored to protect unwilling listeners because it only prevents employers from intimidating, threatening, and restraining an employee who "refuses" to listen to employer-sponsored speech or view employer-sponsored communications concerning why they should or should not engage in group action. 20 C.F.R. § 655.135(h)(2)(ii). The Supreme Court has recognized a legitimate governmental "interest in avoiding unwanted communication" tied to "the broader 'right to be let alone.'" *Hill v. Colorado,* 530 U.S. 703, 716 (2000). There is thus a "significant difference between . . . restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Id*. at 716–17. The Rule falls into the latter category.

---

[6] *See also* U.S. EEOC, Compliance Manual on Religious Discrimination, EEOC-CVG-2021-3, Example 52 (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_62873864446141610750081457; *EEOC v. Aurora Renovations and Developments, LLC d/b/a Aurora Pro Services*, No. 22-490 (M.D.N.C. June 27, 2022) (EEOC action against employer that required employees to attend prayer meetings).

Employers have no right to force unwanted speech on employees. While the First Amendment protects the right to persuade others, "no one has a right to press even 'good' ideas on an unwilling participant." *Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 738 (1970). In *Rowan*, the Supreme Court upheld a statute allowing citizens to stop future mailings to their home by request. If the citizens opted out, mailers had to stop sending to them. *Id*. This Rule functions the same way. Employers are free to speak. But employees are also free to opt out of listening and their employer must honor their choice.

The government may shield individuals from unwanted speech when "the speaker intrudes on the privacy of the home . . . or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975). The Rule fits into the second category of permissible regulation. When employers force their employees to listen to speech under the threat of discharge or discipline, they make it "impractical" for the employees "to avoid exposure." *Id*. Workers depend on their employers for their well-being and that of their families, so much so that it would be "impractical" for them to avoid speech their employer requires them to listen to. H-2A workers are a particularly vulnerable population of workers whose dependence on particular employers not only for their livelihood but for their right to remain in this country renders it even more impractical for them to refuse to comply with an employer's order that they listen to speech. 89 Fed. Reg. at 33,987. Courts have therefore recognized that "[t]he freedom of an unwilling listener to avert one's eyes or ears is

23

considerably lessened when she is required to be on the job." *520 S. Michigan Ave. Assocs., Ltd. v. Unite Here Loc. 1*, 760 F.3d 708, 724 (7th Cir. 2014); *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001) (Alito, J.) ("speech may be more readily subject to restrictions when a school or workplace audience is 'captive' and cannot avoid the objectionable speech").   The Supreme Court has repeatedly held that that government "can choose to protect" this right to be let alone and "may legislate to protect" unwilling listeners. *Hill*, 530 U.S. at 717 n.24; *Frisby v. Schultz*, 487 U.S. 474, 484 (1988). The Rule permissibly does just that.

### C. The Rule is Not Vague

Finally, Plaintiffs argue that the terms of the Rule are vague, but they are also wrong about that.

As demonstrated above, the Rule does not regulate speech, but only conduct. All that the vagueness test requires in this context is that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). What is required is not "mathematical certainty" because "it will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question." *Id.* at 110 n.15 (citing *Am. Comm's Ass'n. v. Douds*, 339 U.S. 382, 412 (1950)). A rule is vague only when "no standard of conduct is specified at all," not when it "requires a person to conform his conduct to an imprecise but comprehensive normative standard." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). "[P]erfect clarity and precise guidance have never been

required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989).

Employers of ordinary intelligence would understand when the "primary purpose" of a meeting is to discuss employees' collective action, and when they "intimidate," "threaten," or "in any other manner discriminate against" employees for refusing to attend such a meeting.[7] The core meaning of those terms, is clear and rules "are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat. Dairy Products Corp.*, 372 U.S. 29, 32 (1963).

The notion that an employer will have trouble determining the "primary purpose" of its own meeting, communication, or speech, is unavailing. The word "primary purpose" has an established meaning—"of first rank, importance, or value."[8] Thus, to be covered by the Rule, the employer speech or communication must be *more* related to protected activity than other issues, rather than merely incidentally touching on such topics.

Furthermore, "primary purpose" and similar terminology is common throughout our law and has never been held to be unconstitutionally vague. Certain non-profit organizations must determine whether they are "primarily engaged" in promoting "the common good and general welfare of the people of the community."

---

[7] Plaintiffs do not suggest any of the other terms in the Rule are vague. *See* Pl. Br. 19.

[8] "Primary," Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/primary.

*Mem'l Hermann Accountable Care Org. v. Comm'r of Internal Revenue,* No. 23-60608, 2024 WL 4586187, at *2–3 (5th Cir. Oct. 28, 2024) (referring to "primary purpose" test). Lawyers must decide whether documents were created for the "primary motivating purpose" of aiding possible future litigation to gauge whether the work-product doctrine applies. *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir. 1981). And, in the context of expressive activity, the CAN-SPAM Act of 2003 regulates certain "commercial electronic mail messages," which it defines to "mean[] any electronic mail message the *primary purpose* of which is the commercial advertisement or promotion of a commercial product or service." 15 U.S.C. § 7702(2)(A) (emphasis added).

Nor are the other terms that Plaintiffs object to vague. First, the terms "discriminate against," "threaten" and "intimidate" were not added by this Rule, but have instead been used in the H-2A regulations for over three decades and were borrowed from federal statutes that have been on the books even longer. *See supra* Subsection I(B).  In the employment context, the term "discriminate against" has been used for generations, as it has been unlawful since the passage of Title VII in 1964 for employers "to discriminate" against persons in protected classes and since the passage of the NLRA in 1935 to engage in "discrimination" against employees who support unions or engage in other concerted activity. *See* 42 U.S.C. § 2000e-2(a)(1) and 29 U.S.C. § 158(a)(3). The terms are used in a vast number of other federal, state, and local employment laws and thus have a well-defined meaning. Similarly, the terms "threaten" and "intimidate" are used in innumerable statutes,

many of which have been upheld by the Fifth Circuit against vagueness challenges. *See CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*, 770 F.2d 468, 476–77 (5th Cir. 1985) (upholding statute that made it a crime to "threaten" or "intimidate" certain foreign officials and observing that "[t]hese terms are obviously widely used and commonly understood in statutory contexts"); *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015) (federal stalking statute "need not define 'harass' and 'intimidate' because they are not obscure words and are readily understandable by most people").

Moreover, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498–99 (1982). And, in particular, "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands . . . plan behavior carefully [and] can be expected to consult relevant legislation in advance of action." *Id.* at 498. Here, the regulated entities can clearly "plan [their] behavior carefully" and, in fact, have an even simpler means to avoid any uncertainty"—they can simply inform the workers that attendance at the meeting they are uncertain about is voluntary.

Finally, the employer made precisely the same vagueness argument in *Gissel Packing*, suggesting that it could not distinguish between a prediction and a threat. 395 U.S. at 620. But the Court rejected the argument, holding, "an employer, who has control over that relationship and therefore knows it best, cannot be heard to

complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in brinkmanship when it becomes all too easy to overstep and tumble (over) the brink." *Id.* (cleaned up). The same is true here.

### III.    The Rule's Protections of Concerted Activities Are Severable

Finally, we emphasize that, even *if* this Court should find any portion of the Rule invalid, it may enjoin only those provisions of the Rule that have actually been challenged by Plaintiffs. Plaintiffs' briefing provides no basis for enjoining the Rule *in its entirety* and the Rule contains an express severability clause.[9] And the Court must, of course, "limit the solution to the problem" when formulating remedies. *Ayotte v. Planned Parenthood*, 546 U.S. 320, 328 (2006).

Plaintiffs' briefing exclusively challenges the Rule's protection of concerted activity at 20 C.F.R. § 655.135(h)(2). While these protections are unquestionably important, they comprise only a tiny part of the Rule, which also includes, but is not limited to:

- Revised definitions of "successors-in-interest" who may be held liable for an employer's violations of H-2A program rules, 20 C.F.R. § 655.104;

- Requiring that employer-provided transportation be operated only when driver and passengers are wearing appropriate seatbelts, 20 C.F.R. § 655.122(h)(4)(ii);

- Setting forth a revised standard for termination "for cause," which waives the worker's right to certain minimum benefits to which they would otherwise be entitled, such as outbound transportation or the "three-fourths guarantee," 20 C.F.R. § 655.122(n);

---

[9] 20 C.F.R. § 655.190 provides that any provision found to be unenforceable "will be severable from this part and shall not affect the remainder thereof."

- Expanding the existing anti-retaliation protections, which protect workers who have consulted with an attorney or an employee of a legal services organization, to cover "key service providers" such as healthcare workers, clergy, or law-enforcement officers, 20 C.F.R. §§ 655.103(b), 655.135(h)(1)(v);

- Changes the effective date of the annual AEWR calculation, *see* 89 Fed. Reg. at 34,048–60.

- Providing a limited right for workers to invite guests into employer-furnished housing, 20 C.F.R. § 655.135(n);

- Prohibiting employers from involuntarily confiscating or withholding worker's passports, 20 C.F.R. § 655.135(o);

- Requiring employers to provide additional information about their foreign labor recruitment activities, including copies of relevant contracts and agreements, 20 C.F.R. § 655.137;

- Modifying debarment procedures for H-2A program violators, 20 C.F.R. § 655.182;

- Revising the procedures concerning discontinuation of State Workforce Agency services under the Wagner-Peyser Act for debarred H-2A program violators, 20 C.F.R. §§ 658.501–04.

It is manifestly clear that neither the NLRA nor the Constitution bars DOL from requiring employers to ensure seatbelt use, preventing employers from confiscating workers' passports, administering a debarment program, or making technical changes in the calculation of the wage rate due H-2A workers, and Plaintiffs make no argument that these provisions are arbitrary and capricious or beyond DOL's statutory authority. Accordingly, while Plaintiffs ask that Court issue an injunction preventing "defendants from enforcing or implementing the Rule," Pl. Br. 23, they have in fact waived any argument as to the vast majority of the Rule's

provisions—indeed, all provisions of the Rule except for 20 C.F.R. § 655.135(h)(2).

No injunction may issue as to the provisions that are not challenged here.

## CONCLUSION

The Court should deny Plaintiff's motion for a stay and a preliminary

injunction.

Dated: November 8, 2024

> Respectfully submitted,
> /s/Joel F. Dillard
> Joel Dillard & Associates
> 775 North Congress St.
> Jackson, MS 39202
> (601)509-1372
> joel@joeldillard.com
> *Counsel for Amicus AFL-CIO*