**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

INTERNATIONAL FRESH PRODUCE
ASSOCIATION, *et al.*,

                Plaintiffs,

      v.

U.S. DEPARTMENT OF LABOR, *et al.*,

                Defendants.

Case No. 1:24-cv-00309-HSO-BWR

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR A SECTION 705 STAY OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

I.     DOL's § 1188 Labor Certification and Rulemaking Authority ............................ 4

II.    The Challenged Provisions ................................................................................ 6

III.   Related Litigation .............................................................................................. 9

IV.   Procedural Background ...................................................................................... 9

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ................................................................................................................... 10

I.     Plaintiffs Fail to Establish Likelihood of Success on the Merits ........................ 10

      A.    The Challenged Provisions Are a Proper Exercise of DOL's § 1188
             Authority and Do Not Violate the NLRA ................................................. 10

      B.    Section 655.135(h)(2)(ii)'s Prohibition of Retaliation Against Employees Who
             Do Not Attend Certain Meetings Does Not Burden Employers' Freedom of
             Speech. ................................................................................................... 29

II.    Plaintiffs Have Not Established That They Are at Risk of Irreparable Harm ...... 33

III.   The Public Interest Weighs Against a Preliminary Injunction. ........................... 36

IV.   Any Relief Should Be Limited to the Plaintiffs That Have Established the
       Requirements for a Preliminary Injunction. ....................................................... 37

V.    If the Court Grants Relief to Plaintiffs, the Court Should Sever Any Provisions
       Found to Be Unlawful from the Remainder of the Final Rule. ........................... 40

CONCLUSION ................................................................................................................ 41

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................... 40

*AFL-CIO v. Dole,*
    923 F.2d 182 (D.C. Cir. 1991) .............................................................. 13, 15, 21

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*
    78 F.4th 210 (5th Cir. 2024) ............................................................................. 40

*Allina Health Servs. v. Sebelius,*
    756 F. Supp. 2d 61–68 (D.D.C. 2010) ............................................................. 37

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.,*
    466 F. Supp. 3d 68 (D.D.C. 2013) .................................................................... 41

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ............................................................................. 38

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor,*
    713 F.3d 1080 (11th Cir. 2013) ......................................................................... 11

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ........................................................................................... 34

*Biden v. Nebraska,*
    600 U.S. 482 (2023) ........................................................................................... 21

*Boire v. Pilot Freight Carriers, Inc.,*
    515 F.2d 1185 (5th Cir. 1975) ........................................................................... 34

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ...................................................................... 39, 40

*California v. Texas,*
    593 U.S. 659 (2021) ........................................................................................... 35

*California v. U.S. Bureau of Land Mgmt.,*
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............................................................ 40

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ..................................................................... 24, 26

*Chamber of Com. v. City of Seattle,*
    890 F.3d 769 (9th Cir. 2018) ............................................................................. 25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
    467 U.S. 837 (1984) ........................................................................................... 11

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York,*
   447 U.S. 530 (1980) ................................................................ 30

*Cornish v. Dudas,*
   540 F. Supp. 2d 61 (D.D.C. 2008) ..................................... 37

*Dep't of Homeland Sec. v. New York*
   140 S. Ct. 599 (2020) ...................................................... 38, 39

*Expressions Hair Design v. Schneiderman,*
   581 U.S. 37 (2017) ................................................................ 30

*Fath v. Texas Dep't of Transp.,*
   924 F.3d 132 (5th Cir. 2018) ............................................. 28

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ................................................. 20, 21, 28

*Fischer v. United States,*
   603 U.S. 480 (2024) ............................................................ 33

*Garcia-Celestino v. Ruiz Harvesting, Inc.,*
   843 F.3d 1276 (11th Cir. 2016) ..................................... 14, 18

*Gill v. Whitford,*
   585 U.S. 48 (2018) ............................................................. 38

*Golden State Transit Corp. v. City of Los Angeles,*
   493 U.S. 103 (1989) ........................................................... 25

*Gonannies, Inc. v. Goupair.Com, Inc.,*
   464 F. Supp. 2d 603 (N.D. Tex. 2006) ............................. 34

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
   968 F.3d 454 (5th Cir. 2020) ......................................... 18, 19

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013) ........................................................... 35

*Holly Farms Corp. v. NLRB,*
   517 U.S. 392 (1996) ........................................................... 22

*Home Depot, Inc. v. Guste,*
   777 F.2d 1063 (5th Cir. 1985) ....................................... 32, 33

*Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n,*
   427 U.S. 132 (1976) ....................................................... 24, 25

*Jordan v. Fisher,*
   823 F.3d 805 (5th Cir. 2016) ............................................. 10

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.,*
No. 3:16cv1651L, 2016 WL 4944370 (N.D. Tex. Sept. 16, 2016) ................................. 34

*K Mart Corp. v. Cartier, Inc.,*
486 U.S. 281 (1988) ................................................................................................. 41

*Kan. ex rel. Kan. Dep't for Children & Families v. SourceAmerica,*
874 F.3d 1226 (10th Cir. 2017) ................................................................................ 36

*Kansas v. DOL,*
No. 2:24cv00076, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024) ................................... 2

*Karr v. Schmidt,*
460 F.2d 609 (5th Cir. 1972) ................................................................................... 31

*Lehman v. City of Shaker Heights,*
418 U.S. 298 (1974) ................................................................................................. 31

*Lollar v. Baker,*
196 F.3d 603 (5th Cir. 1999) ................................................................................... 27

*Loper Bright Enter. v. Raimondo,*
144 S. Ct. 2244 (2024) ................................................................................. 11, 12, 21

*Louisiana v. Becerra,*
20 F.4th 260 (5th Cir. 2021) ................................................................................... 39

*Madsen v. Women's Health Ctr., Inc.,*
512 U.S. 753 (1994) ................................................................................................. 38

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ................................................................................................. 36

*MD/DC/DE Broadcasters Ass'n v. FCC,*
236 F.3d 13 (D.C. Cir. 2001) ................................................................................... 41

*Mendoza v. Perez,*
754 F.3d 1002 (D.C. Cir. 2014) ............................................................................... 11

*Munaf v. Geren,*
553 U.S. 674 (2008) ................................................................................................. 10

*Nat. Res. Def. Council v. U.S. Dep't of Energy,*
362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...................................................................... 40

*Nat'l Ass'n of Mfrs. v. Perez,*
103 F. Supp. 3d 7 (D.D.C. 2015) ............................................................................. 26

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................................. 37

iv

*NLRB. v. Gissel Packing Co.,*
    395 U.S. 575 (1969) ................................................................ 30, 32, 33

*NLRB. v. Riley-Beaird, Inc.,*
    681 F.2d 1083 (5th Cir. 1982) ................................................................ 30

*NLRB. v. Virginia Elec. & Power Co.,*
    314 U.S. 469 (1941) ................................................................ 31, 32

*Ohio v. Becerra,*
    577 F. Supp. 3d 678 (S.D. Ohio 2021) ................................................................ 36

*Otsuka Pharm. Co. v. Burwell,*
    No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) ................................................................ 37

*Overdevest Nurseries v. Walsh,*
    2 F.4th 977 (D.C. Cir. 2021) ................................................................ 18

*Pastel Cartel, LLC v. U.S. Food & Drug Admin.,*
    No. 1:23cv1010DAE, 2023 WL 9503484 (W.D. Tex. Dec. 14, 2023) ................................................................ 34

*POM Wonderful LLC v. Coca-Cola Co.,*
    573 U.S. 102 (2014) ................................................................ 26, 27, 28

*Powers v. Ohio,*
    499 U.S. 400 (1991) ................................................................ 35

*Reyes-Trujillo v. Four Star Greenhouse, Inc.,*
    513 F. Supp. 3d 761 (E.D. Mich. 2021) ................................................................ 19

*Rowan v. U.S. Post Off. Dep't,*
    397 U.S. 728 (1970) ................................................................ 3, 30, 31

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................ 40

*San Diego Building Trades Council v. Garmon,*
    359 U.S. 236 (1959) ................................................................ 24

*Sorrell v. IMS Health, Inc.,*
    564 U.S. 552 (2011) ................................................................ 31

*Texas v. U.S. Dep't of Labor,*
    No. 4:24cv499SDJ, 2024 WL 3240618 (E.D. Tex. June 28, 2024) ................................................................ 40

*Thomas v. Collins,*
    323 U.S. 516 (1945) ................................................................ 30

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ................................................................ 38, 39, 40

*UAW-Lab. Emp. & Training Corp. v. Chao,*
    325 F.3d 360 (D.C. Cir. 2003) ............................................................... 24, 26

*UFW v. Ariz. Agric. Emp't Rels. Bd.,*
    669 F.2d 1249 (9th Cir. 1982) ............................................................... 25

*VanDerStok v. Garland,*
    633 F. Supp. 3d 847 (N.D. Tex. 2022) .................................................. 40

*Villegas v. Princeton Farms, Inc.,*
    893 F.2d 919 (7th Cir. 1990) ................................................................ 25

*Vita-Mix Corp. v. Tristar Prod., Inc.,*
    No. 1:07cv275, 2008 WL 11383504 (N.D. Ohio Sept. 30, 2008) .................... 34

*Watterson v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
    No. 4:23-CV-00080, 2024 WL 897595 (E.D. Tex. Mar. 1, 2024) ..................... 10

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................. 40

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ............................................................................. 20, 21

*Williams v. Usery,*
    531 F.2d 305 (5th Cir. 1976) ................................................................ 7

*Willmar Poultry Co. v. Jones,*
    430 F. Supp. 573 (D. Minn. 1977) ......................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ 10, 34

**Statutes**

5 U.S.C. § 705 ........................................................................................ 39, 40

8 U.S.C. § 655.122 .................................................................................. 13

8 U.S.C. § 1101 ....................................................................................... 4, 15, 16

8 U.S.C. § 1184 ....................................................................................... 4, 5

8 U.S.C. § 1188 ....................................................................................... *passim*

29 U.S.C. § 152 ....................................................................................... 2, 22, 23

29 U.S.C. § 157 ....................................................................................... 22

29 U.S.C. § 158 ....................................................................................... 23, 33

29 U.S.C. § 159 ....................................................................................... 23

29 U.S.C. § 203 ....................................................................................... 8, 22

29 U.S.C. § 213 ....................................................................................... 24

29 U.S.C. §§ 49d(a), 49e(b), 49f(a) ................................................................. 36

Cal. Lab. Code § 1153 ................................................................................... 26

Colo. Rev. Stat. 8-13.5-201 .......................................................................... 26

Labor Law Code §§ 701-718 ........................................................................ 26

Or. Rev. Stat. secs. 658.405 .......................................................................... 26

**Regulations**

20 C.F.R. §655.122 ...................................................................................... 13

20 C.F.R. § 653.501 ...................................................................................... 36

20 C.F.R. § 655.101 ...................................................................................... 12

20 C.F.R. § 655.103 ................................................................................ *passim*

20 C.F.R. § 655.121 ........................................................................................ 5

20 C.F.R. § 655.122 .................................................................... 13, 17, 18, 41

20 C.F.R. § 655.135 ................................................................................ *passim*

20 C.F.R. § 655.137 ...................................................................................... 41

20 C.F.R. § 655.182 ...................................................................................... 41

20 C.F.R. § 658.501–04 ............................................................................... 41

29 C.F.R. § 501.4 .................................................................................... *passim*

29 C.F.R. § 780.3 .......................................................................................... 24

43 Fed. Reg. 10,306, 10,312 ........................................................................ 12

52 Fed. Reg. 20,496 (June 1, 1987) ........................................................ *passim*

52 Fed. Reg. 20,524 (June 1, 1987) ........................................................... 5, 20

73 Fed. Reg. 77,110 (Dec. 18, 2008) .......................................................... 21

75 Fed. Reg. 6,884 (Feb. 12, 2010) ......................................................... 13, 21

89 Fed. Reg. 33,898, 33,991 (Apr. 29, 2024) ......................................... *passim*

**INTRODUCTION**

Nearly 40 years ago, Congress delegated authority to the Department of Labor ("DOL")[1] to ensure that the hiring of temporary nonimmigrant farmworkers pursuant to the H-2A program did not "adversely affect the wages and working conditions of workers in the United States similarly employed." *See* 8 U.S.C. § 1188(a)(1). Beginning in 1987 and over the last four decades, DOL has promulgated regulations to implement that clear and broad statutory command. The Challenged Provisions[2] are an incremental adjustment that builds on these existing regulations. In light of the H-2A workforce's unique vulnerabilities, these provisions seek to place such workers "on more equal footing with similarly employed workers and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." Final Rule, *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898, 33,991 (Apr. 29, 2024) ("Final Rule" or "Rule"). The Challenged Provisions afford workers employed under the H-2A program—both H-2A workers and their domestic non-H-2A co-workers—the tools necessary to advocate for themselves in response to H-2A employers who fail to provide the required baseline wages and working conditions. "Empowering workers in this way thus can improve compliance with the various terms and conditions of H-2A employment that [DOL] has separately determined are necessary to prevent adverse effect on similarly employed workers." *Id.* at 33,991.

Notwithstanding the Rule's fealty to Congress's direction, ten associations ("Private Plaintiffs") and the State of Mississippi (collectively, "Plaintiffs") allege that the Challenged Provisions

---

[1] All Defendants join this opposition to Plaintiffs' motion for preliminary relief. Defendants are the United States Department of Labor; Julie Su, Acting U.S. Secretary of Labor, in her official capacity; Jose Javier Rodriguez, Assistant Secretary for Employment and Training, U.S. Department of Labor, in his official capacity; and Jessica Looman, Administrator of the Wage & Hour Division, U.S. Department of Labor, in her official capacity.

[2] Private Plaintiffs have challenged 20 C.F.R. § 655.135(h) and (m). *See* Priv. Pls.' Mot. at 4-5, ECF No. 18; *see also* State Pl.'s Joinder, ECF No. 19 (adopting arguments raised by Private Plaintiffs except those pertaining to the First Amendment). Neither set of Plaintiffs, however, presents any argument as to why § 655.135(m) specifically is unlawful. In Section IV, Defendants explain why permanent relief, if any, should not extend even to all of the Challenged Provisions or all of the Plaintiffs. As further explained in Section V, under no circumstances should any relief apply to the entire Final Rule.

violate the National Labor Relations Act ("NLRA") and the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"). *See generally* Priv. Pls.' Mot.; State Pl.'s Joinder. The Private Plaintiffs also allege that portions of the Challenged Provisions violate the First Amendment. *See generally* Priv. Pls.' Mot.

Plaintiffs are unlikely to succeed on the merits. As another district court recently concluded in a challenge to the same Final Rule, "the 'best reading' of [8 U.S.C.] § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *See Kansas v. DOL*, No. 2:24-cv-00076, 2024 WL 3938839, at *15 (S.D. Ga. Aug. 26, 2024) ("*Kansas* Order"). That includes the authority to amend 20 C.F.R. § 655.135(h) and promulgate the Challenged Provisions: "DOL acted within its authority as proscribed by Congress through [IRCA]" when it issued these provisions. *Id.* at 19. DOL also "provided sufficient reasoning for its decision." *Id.* at 18; *see also id.* at 18–19 (describing "DOL's extensive response to criticisms of the Final Rule's ability to alleviate adverse effects on American agricultural workers").

Nor do the Rule's revisions conflict with the NLRA. The Challenged Provisions only prevent H-2A employers from retaliating against covered workers in the H-2A program for engaging in certain protected activities, such as speaking together with their employer about working conditions (*i.e.*, engaging in protected concerted activity). They do not extend the protections or enforcement mechanisms of the NLRA—which provides an entire regulatory and adjudicative structure to interpret and enforce specific rights, including through a collective bargaining process—to workers in the H-2A program. In any event, Plaintiffs point to no provision of the NLRA that prohibits DOL from promulgating the Challenged Provisions. Instead, Plaintiffs assert that these provisions violate the NLRA because that law's definition of "employee" does "not include any individual employed as an agricultural laborer." *See* 29 U.S.C. § 152(3). But that definitional provision does not preclude wholesale any regulation of agricultural employees' interactions with their employers. It is well established that individuals that fall outside of the NLRA's "employee" definition may be covered by other labor statutes and regulations—including those promulgated by other federal agencies.

Private Plaintiffs' other claim—that portions of § 655.135(h) violate the First Amendment—also fails. That provision prohibits retaliation against employees who decline to participate in "captive audience meetings" where employers require workers to listen to their views on activities protected under the H-2A program. The provision targets retaliation, which is conduct and not speech, and thus it is not subject to strict scrutiny. Employers remain free to express themselves however and whenever they choose. Their only limitation is that they cannot hold an audience captive, but under the First Amendment, "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan*, 397 U.S. at 738. Private Plaintiffs further allege that the provision is unconstitutionally vague as a facial matter. Not so, for DOL thoroughly explained how the rule will be applied, the regulation lends itself to easy interpretation under traditional canons of statutory interpretation, and Plaintiffs cannot meet their burden on a facial challenge to show the provision is impermissibly vague in all but a miniscule number of applications.

Plaintiffs are also not entitled to a preliminary injunction because they cannot establish irreparable harm. Plaintiffs waited more than five months after the Final Rule was issued before filing a lawsuit, and their delay belies any need for emergency relief now. Moreover, the State has not alleged any irreparable harm in connection with the only provisions that it challenges. Further, any administrative costs that are related to the Challenged Provisions do not constitute irreparable harm because the State already receives federal funds for its role in processing H-2A job orders. Any *de minimis* increase in administrative costs is insufficient. The public interest and balance of equities, including the need to fulfill Congress's directive to prevent adverse effects to workers in the United States, also weigh against issuance of an injunction. To the extent any of the Plaintiffs have established all four factors required for injunctive relief, any relief should be limited to those parties and only as to those provisions as to which all four factors are met. A universal remedy or nationwide injunction is not appropriate in this case. And any offending provision is severable from the remainder of the Rule.

The Court should deny Plaintiffs' motion.

**BACKGROUND**

I.     **DOL's § 1188 Labor Certification and Rulemaking Authority**

The INA, as amended by IRCA, establishes an "H-2A" nonimmigrant visa classification for a worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform" temporary or seasonal "agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. §§ 1184(c)(1), 1188. The statute requires multiple federal agencies to take several steps before foreign workers may be admitted to the United States under the H-2A classification.

A prospective H-2A employer must apply to DOL for a temporary employment certification ("TEC"). Congress authorized DOL to issue a TEC only if certain statutory requirements are met. First, DOL must certify that:

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Unless both conditions (A) and (B) are established, DOL may not issue a TEC. *Id.* § 1188(b). Second, DOL may not issue a TEC "if any" of the additional conditions listed in 8 U.S.C. § 1188(b) exists, such as if "[t]here is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification" or in the previous two years, the employer employed H-2A workers and "substantially violated a material term or condition" of a TEC. *Id.* Third, certain rules "shall apply in the case of the filing and consideration of an application for a labor certification under [§ 1188(a)]." *Id.* § 1188(c). For example, DOL must ensure that the employer (i) "has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)" and (ii) does not have "qualified eligible individuals . . . to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary." *Id.* § 1188(c)(3)(A). Congress also required that an employer hire qualified U.S. workers who apply for the job during the first half of the "period of the [seasonal] work

4

contract," 8 U.S.C. § 1188(c)(3)(B)(i); *accord* 20 C.F.R. § 655.135(d), that the sponsoring employer "provide benefits, wages and working conditions required pursuant to this section and regulations," 8 U.S.C. § 1188(c)(3)(B)(i).

To apply for a TEC, employers must first complete and submit a job order to DOL, 20 C.F.R. §§ 655.103(b), 655.121(b), which then transmits a copy to the State Workforce Agency ("SWA") in the relevant state, *id.* § 655.121(e)(1).   The SWA then must confirm that the job order complies with various requirements, including that the employer has agreed to abide by "the requirements of [20 C.F.R. part 655, subpart B]."   20 C.F.R. § 655.121(e)(2); *see also id.* § 655.121(a)(4).   One of the longstanding requirements of subpart B is that an employer make a number of "assurances," including that it will not engage in discriminatory hiring practices, is not seeking H-2A workers among an ongoing strike or lockout, and has not treated or will not treat unfairly any person who has engaged in a host of protected activities.   *See* 20 C.F.R. § 655.135.[3]   After reviewing the job order, the SWA works with the employer to address any noted deficiencies.   *Id.* § 655.121(e)(2).   If the job order is fully compliant, the SWA will "place the job order in intrastate clearance and commence recruitment of U.S. workers."   *Id.* § 655.121(f).   Once an employer obtains a TEC, it may then file a petition for a nonimmigrant worker with the United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS").   *See* 8 U.S.C. § 1184(c).

---

[3] Congress also delegated broad authority to DOL to ensure that employers provide these baseline protections.   *See* 8 U.S.C. § 1188(g)(2) (authorizing DOL to "impos[e] appropriate penalties and seek[] appropriate injunctive relief and specific performance of contractual obligations" as "necessary to assure employer compliance with terms and conditions of employment under this section.").   As explained in 1987, "[i]t is clear from the enactment of IRCA . . . that the Congress intended that DOL would increase its effort regarding the enforcement of labor standards with respect to the H-2A programs." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the INA,* 52 Fed. Reg. 20,524, 20,524 (June 1, 1987) ("1987 WHD IFR").

## II.     The Challenged Provisions

Since 1987, the H-2A statutory and regulatory scheme has provided numerous wage and working condition protections for H-2A visa workers and workers in corresponding employment,[4] including anti-retaliation provisions.  *See, e.g., Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States,* 52 Fed. Reg. 20,496, 20,517 (June 1, 1987) ("1987 H-2A IFR").  Before DOL promulgated the Final Rule, these anti-retaliation protections provided that H-2A employers may not "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has "filed a complaint," "instituted" a "proceeding," "testified" "in any proceeding," "consulted with an employee of a legal assistance program or an attorney," or "exercised or asserted on behalf of themselves or others any right or protection afforded by 8 U.S.C. § 1188" or DOL regulations.  20 C.F.R. § 655.135(h) (effective Nov. 14, 2022); 29 C.F.R. § 501.4(a) (effective Nov. 14, 2022).

Despite these protections, DOL found that "violations of the H-2A program requirements remain pervasive."  89 Fed. Reg. at 33,989; *see also id.* at 33,988 (citing violation data).  DOL further found that H-2A visa workers represent a population especially vulnerable to exploitation because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer."  *Id.* at 33,987.  It also found that retaliation against H-2A workers for asserting or advocating for their rights remains common.  *Id.* at 33,993.  In some instances, DOL has "debarred and assessed penalties against H-2A employers that instructed workers to lie about their pay to investigators and threatened to kill, harm, punish, fire, blacklist, or deport workers for talking to authorities."  *Id.* at 33,998.  Based on this experience, DOL deemed existing H-2A program regulations insufficient to protect H-2A workers who advocate for themselves regarding working conditions.  *Id.* at 33,987.  DOL determined that enabling H-2A workers to advocate for themselves would lead to

---

[4] "Corresponding employment" refers to the employment of non-H-2A workers by an employer who has an approved *Application for Temporary Employment Certification* in any work included in the job order, or in any agricultural work performed by the H-2A workers.  20 C.F.R. § 655.103, 29 C.F.R. § 501.3(a).

"significantly" fewer violations of the H-2A baseline requirements that are necessary to avoid adverse effect on domestic workers. *Id.* at 33,991–92.

The agency further found that similarly employed domestic workers "may be less likely to face the unique vulnerabilities and forms of retaliation experienced by H-2A workers." *Id.* at 33,992. Because H-2A workers are easier to exploit, some employers are more likely to fill jobs through the H-2A program and less likely to hire U.S. workers. *See id.* at 33,991. Because DOL is required to certify that H-2A workers will not adversely affect workers in the United States, *see id.* at 33,993 (citing 8 U.S.C. § 1188(a)(1)), additional protections were necessary in order to "place the H-2A workforce on more equal footing with similarly employed workers [in the United States] and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." *Id.*

DOL issued the Final Rule to "establish the minimum terms and conditions of employment (*i.e.*, the 'baseline' working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" *See id.* at 33,987 (quoting *Williams v. Usery*, 531 F.2d 305, 306–07 (5th Cir. 1976)). The Challenged Provisions expand the list of activities protected from retaliation to safeguard the ability of workers covered by the H-2A program to band together to express concerns and ask for changes in their working conditions (*i.e.*, to engage in concerted activities for mutual aid and protection). *Id.* at 33,990. The Challenged Provisions also impose "new employer obligations" that ensure H-2A employers do not retaliate against workers because those workers have expressed such concerns about their working conditions or declined to attend an employer-sponsored meeting whose primary purpose is to communicate the employer's opinion concerning protected activities. *Id.* at 33,991. Plaintiffs' claims are directed at revisions to 20 C.F.R. § 655.135, including:

- 20 C.F.R. § 655.135(h)(1)[5]: H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has:

  - § 655.135(h)(1)(v): "Consulted with a key service provider . . ."

---

[5] Parallel provisions appear at 29 C.F.R. § 501.4.

- ○ § 655.135(h)(1)(vii): "Filed a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws"

  - ○ § 655.135(h)(2)(i)[6]: "Has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities"

  - ○ § 655.135(h)(2)(ii): "Has refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart"

- • 20 C.F.R. § 655.135(m): "With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the Application for Temporary Employment Certification, the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview. Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means."

Various provisions of the Final Rule carry different effective dates. Most relevantly, the anti-retaliation provisions at 29 C.F.R. § 501.4(a) were scheduled to take effect on June 28, 2024, while the

---

[6] 20 C.F.R. § 655.135(h)(2) & (m) apply only to persons engaged in agriculture as defined and applied in 29 U.S.C. § 203(f), *i.e.*, persons exempt from the NLRA. *See* 89 Fed. Reg. at 33,991.

revisions at 20 C.F.R. § 655.135(h) and (m) were scheduled to apply to clearance orders and associated H-2A applications received on or after August 29, 2024.  *See* 89 Fed. Reg. at 33,904.[7]

## III.    Related Litigation

On June 10, 2024, a group of seventeen States and two private parties filed a lawsuit in the Southern District of Georgia challenging certain provisions of the Final Rule.  *See Kansas v. DOL*, No. 2:24-cv-00076-LGW-BWC (S.D. Ga.).  Those plaintiffs filed a motion for a preliminary injunction on June 13, 2024, *id.*, ECF No. 19, and on August 26, 2024, the court granted the motion and enjoined DOL from enforcing the Final Rule in the seventeen plaintiff States and against the private plaintiffs in that case, *Kansas* Order at 37.  Two other cases challenging parts of the same Final Rule have since been filed in the Eastern District of Kentucky and the Eastern District of North Carolina.  *See Barton v. DOL*, No. 5:24-cv-00249-DCR (E.D. Ky.); *N.C. Farm Bureau Fed'n, Inc. v. DOL*, No. 5:24-cv-00527-FL (E.D.N.C.).  The *Barton* court held a hearing on Plaintiffs' motion for a preliminary injunction or stay on November 4, 2024.

## IV.    Procedural Background

Ten associational plaintiffs ("Private Plaintiffs") and the State of Mississippi (collectively, "Plaintiffs") filed this matter on October 8, 2024.  ECF No. 1.  On October 17, 2024, Plaintiffs filed an amended complaint.  ECF No. 16.  That same day, Private Plaintiffs filed a motion for a § 705 stay or preliminary injunction.  ECF No. 17.  On October 21, 2024, the State filed a notice stating that the State joined the arguments presented in Private Plaintiffs' motion "except [as to] those claims and arguments pertaining to the Private Plaintiffs' First Amendment causes of action."  ECF No. 19 at 1.  The Court set a hearing on Plaintiffs' motion for November 18, 2024.  ECF No. 20.

## <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up).  A plaintiff may obtain this

---

[7] In response to litigation in the *Kansas* case, DOL issued a notice stating that the Final Rule's revisions to 29 C.F.R. § 501.4(a) would not be enforced until August 29, 2024.  *See Kansas v. DOL*, No. 2:24-cv-00076-LGW-BWC (S.D. Ga.), ECF No. 28, ¶ 4.

"extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The party seeking a preliminary injunction thus bears the burden to show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).  "An analysis of whether a stay is appropriate under § 705 considers the same elements required for injunctive relief." *Watterson v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 4:23-CV-00080, 2024 WL 897595, at *20 (E.D. Tex. Mar. 1, 2024).

## ARGUMENT

I.      **Plaintiffs Fail to Establish Likelihood of Success on the Merits.**

 **A.  The Challenged Provisions Are a Proper Exercise of DOL's § 1188 Authority and Do Not Violate the NLRA.**

  **1.   Section 1188 Authorizes DOL to Issue the Challenged Provisions.**

As the *Kansas* court recently explained, "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Kansas* Order at *15.  That includes the authority to promulgate the challenged provisions related to concerted activity: "DOL acted within its authority as proscribed by Congress through [IRCA]" when it issued these provisions. *Id.* at *19; *see also id.* ("Final Rule does not exceed [rulemaking] authority granted to the DOL by Congress under § 1188.").

 **a.** Congress delegated broad authority to DOL to promulgate regulations to ensure that an employer's use of H-2A workers would not harm similarly employed workers in the United States. "Section 1188(a)(1) establishes the INA's general mission," but "Congress left it to [DOL] to implement that mission through the creation of specific substantive provisions." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (describing DOL's authority without suggesting § 1188 is ambiguous or relying on *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244 (2024)).  Congress "often enact[s]" statutes in which "the

agency is authorized to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263. "[S]ome statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* (citation omitted). "Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.* (citation omitted).

Section 1188 is one such statute that "delegates discretionary authority to an agency." *See id.* "The statute explicitly envisions implementing regulations that will clarify the meaning and application of its provisions." *Mendoza*, 754 F.3d at 1021-22 (citing 8 U.S.C. § 1188(b)(1), subsections of (c)(3), and (c)(4)); *see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) (IRCA "expressly *grants* DOL rulemaking authority over the agricultural worker *H-2A* program".

The rulemaking "authority Congress conferred upon DOL can be found in § 1188 of the IRCA." *Kansas* Order at *14. In § 1188(c), Congress set forth rules that "shall apply in the case of the filing and consideration of an application for a labor certification under this section"—*i.e.*, the labor certification described in § 1188(a). 8 U.S.C. § 1188(c); *see also Kansas* Order at *14 ("Section 1188(c) expounds upon the DOL's role in the certification process by providing 'rules [that] apply in the case of the filing and consideration of an application for a labor certification.'"). Subsection (c)(3)(A) then provides:

> The Secretary of Labor shall make, not later than 30 days before the date such labor or services are first required to be performed, the certification described in subsection (a)(1) if—
>
> > (i) the employer has complied with the *criteria for certification* (including criteria for the recruitment of eligible individuals *as prescribed by the Secretary*), and
> >
> > (ii) the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on *the terms and conditions of a job offer which meets the requirements of the Secretary.*

8 U.S.C. § 1188(c)(3)(A) (emphasis added). Other provisions in § 1188 reflect that these *criteria* and *requirements* will be laid out in *regulations*. For example, § 1188(c)(3)(B) describes the circumstances in which employers must "offer to provide benefits, wages and working conditions required pursuant to

11

this section *and regulations*." *Id.* § 1188(c)(3)(B)(i) (emphasis added); *see also id.* § 1188(b)(2)(A) (referring to "material term[s] [and] condition[s] of the labor certification" described in § 1188(a)). The statute as a whole, and § 1188(c)(3) in particular, vests the Secretary[8] with authority to issue regulations governing the terms and conditions of employment under the program, and thus with discretionary authority to "give meaning" to and "fill up the details" of § 1188(a)(1)(B)'s adverse-effect standard (which is cross-referenced in § 1188(c)(3)(A)). As the *Kansas* court explained, "Congress grants the DOL the power to issue regulations to ensure that the certification requirements of § 1188(a)—specifically, the requirement that American agricultural workers not be adversely affected—are met before the DOL issues such a certification." *Kansas* Order at 14-15.

**b.** Soon after IRCA's enactment in 1986, DOL began issuing regulations to effectuate its statutory responsibility under what is now § 1188(a).[9] *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,507 (describing "methodology for the two-fold determination of availability of domestic workers and of any adverse effect"); *see also Loper Bright*, 144 S. Ct. at 2258 ("respect to [agency] interpretations of federal statutes" is "especially warranted when [such interpretations are] issued roughly contemporaneously with enactment of the statute and remain[] consistent over time"). In issuing these regulations, DOL "has historically understood the INA's adverse effect requirement" as (1) "establishing a baseline 'acceptable' standard for working conditions below which workers in the United States would be adversely affected" and (2) "requiring parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer." 89 Fed. Reg. at 33,987.

For example, a TEC application must contain the terms and conditions of employment, 20 C.F.R. § 655.122(b), (c), and the employer must agree to abide by all H-2A regulations, *id.* § 655.135.

---

[8] The Secretary's authority has been delegated to "the Office of Foreign Labor Certification (OFLC)," which is tasked with issuing TECs, as well as WHD, which is tasked with "conduct[ing] certain investigatory and enforcement functions with respect to terms and conditions of employment" under the H-2A program. *See* 20 C.F.R. § 655.101(a), (b).

[9] The 1987 regulations retained the minimum terms and conditions of employment set forth in the 1978 pre-IRCA regulations. *See* 1978 H-2A Rule, 43 Fed. Reg. 10,306, 10,312.

In addition, DOL's offered wage provision requires employers to offer, advertise in their recruitment, and pay the highest of various wages, including the Adverse Effect Wage Rate ("AEWR"), the prevailing wage, any collective bargaining wage, and the federal and state minimum wages. *See* 20 C.F.R. §§ 655.120(a), 655.122(*l*).[10]  The applicable wage must be offered to U.S. workers, and then—to the extent an insufficient number of U.S. workers are willing to perform the requested labor—to both H-2A workers and workers in corresponding employment. *Id.* § 655.122(a), (*l*).  Other regulations setting forth minimum terms and conditions of employment similarly prevent adverse effects to workers in the United States.[11]  So too does the regulatory requirement—issued shortly after IRCA's enactment—that employers provide assurances that they will not retaliate against workers for taking steps to ensure employer compliance with the requirements of IRCA and its implementing regulations. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing assurances).

   **c.** DOL properly promulgated the Challenged Provisions in exercise of this broad rulemaking authority. *Kansas* Order at 16-18 (summarizing Final Rule's rationale).  DOL concluded that these provisions are necessary to ensure that H-2A employment does not adversely affect the wages and working conditions of workers in the United States similarly employed for two principal reasons.

---

[10] Two of the wages described in the offered wage provision at 20 C.F.R. §§ 655.120(a) and 655.122(*l*) are specific to the H-2A program; these wages are not statutorily required to be offered and paid to applicable agricultural workers employed by non-H-2A employers.  However, they are intended to prevent adverse effects to workers in the United States generally.  The prevailing wage rate is the wage paid to domestic workers performing a particular agricultural activity in the same region in which H-2A temporary workers will be employed. *Id.* §§ 653.501(c)(2)(i), 655.103(b).  Likewise, the AEWR "is designed to prevent the potential wage-depressive impact of foreign workers on the domestic agricultural workforce," 75 Fed. Reg. 6,884, 6,891 (Feb. 12, 2010) ("2010 H-2A Final Rule"), by setting a "rate [that] will neither ratchet wages upward, driving growers out of business nor perpetuate wage depression," *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991).  DOL's "AEWR regulations are . . . promulgated under [the] statutory authority" found in 8 U.S.C. § 1188(a)(1). *Id.* at 184 n.3.  The requirement to pay the highest applicable wage rate ensures that H-2A employers cannot use the H-2A program to pay wages that would not be competitive for workers in the United States.

[11] *See, e.g.,* 20 C.F.R. § 655.122(f) (employer provided items); *id.* § 655.122(g) (meals); *id.* §655.122(h) (inbound and outbound transportation); *id.* § 655.122(i) (guarantee to offer the worker employment for at least three-fourths of the work contract); *id.* § 655.122(j) (earnings records); *id.* § 655.122(k) (hours and earnings statements); *id.* § 655.122(m) (frequency of pay); *id.* § 655.122(n) (termination for cause); *id.* § 655.122(o) (protections in the event of contract impossibility); *id.* § 655.122(p) (deductions); *id.* § 655.122(q) (provision of work contract).

First, for agricultural workers in the United States to meaningfully be able to assert their rights and advocate regarding wages and working conditions, their H-2A program counterparts must be able to do the same without the grave and unique risks that retaliation means for them. *See* 89 Fed. Reg. at 33,987 (explaining "the characteristics of the H-2A program, including the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer" that "create a vulnerable population of workers for whom it is uniquely difficult to advocate or organize regarding the terms and conditions of employment or to seek access to certain service providers"). Domestic agricultural workers who are not satisfied with their working conditions or who believe their employer has violated federal or state laws may express their dissatisfaction by obtaining other employment. That is not an option for H-2A workers because their temporary nonimmigrant visa permits them to work only for the sponsoring employer. If employers could turn to the relatively captive and vulnerable H-2A workforce to undermine efforts by workers in the United States to advocate about wages and working conditions, the H-2A program would directly have an adverse effect on those workers in the United States. *See Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016) ("The H-2A regulations . . . require an 'employer' to provide certain minimum benefits to H-2A temporary workers," thereby "ensur[ing] that foreign workers will not appear more attractive to the 'employer' than domestic workers . . . .").

Second, these provisions "seek[] to expand and improve the tools available to workers protected under the H-2A program to prevent exploitation and to ensure compliance with the law," based on DOL's "experience and evidence . . . demonstrating that the current framework of protections are insufficient to satisfy the Department's statutory mandate" to prevent adverse effects. 89 Fed. Reg. at 33,995; *see also id.* at 33,990 (similar). "Empowering workers in this way thus can improve compliance with the various terms and conditions of H-2A employment that the Department has separately determined are necessary to prevent adverse effect on similarly employed workers." *Id.* at 33,991.

Plaintiffs argue that Congress "assigned [to DOL] a narrow role" limited to the Secretary's certification authority under § 1188(a)(1) and (b). Priv. Pls.' Mot. at 3; *see also id.* at 7 ("Congress gave

DOL limited duties under the statute."). This is incorrect and, in fact, Plaintiffs later acknowledge six "explicit grants of rulemaking authority to DOL." *Id.* at 7-9 (citing 8 U.S.C. § 1101(a)(15)(H)(ii)(a), 8 U.S.C. § 1188(a)(2), (c)(3)(A)(i), (c)(3)(B)(iii), (c)(4), and (e)(1)). But even then, Plaintiffs wrongly characterize this authority as narrowly circumscribed. *See id.* Contrary to Plaintiffs' assertions and as the *Kansas* court recognized, *see Kansas* Order at *16–18, IRCA instead represents a "broad congressional delegation" to DOL in which "Congress entrusted" the agency with a significant role: "strik[ing] the balance" between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers"—interests "which are often in tension," *Dole*, 923 F.2d at 187. DOL has made that determination since prior to IRCA's enactment in 1987, including by setting minimum standards and protections for H-2A workers and those in corresponding employment. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,496 ("IRCA codif[ies] DOL's role" in the "agricultural labor certification process" to prevent adverse effects). And in enacting the IRCA, Congress vested DOL with "discretion" to determine "how to ensure that the importation of farmworkers met the statutory requirements." *Dole*, 923 F.2d at 184.

As explained above, *see supra* at 4-5, § 1188(c)(3)(A) specifically provides that the Secretary shall "prescribe[]" "criteria for certification" and "the terms and conditions of a job offer which meets the requirements of the Secretary." 8 U.S.C. § 1188(c)(3)(A). And, as Plaintiffs concede, *see* Priv. Pls.' Mot. at 7-9, § 1188 repeatedly refers to DOL "regulations" governing the wages and working conditions of the H-2A program. *See, e.g.*, 8 U.S.C. § 1188(c)(3)(B)(i) (requiring that H-2A employers "offer to provide benefits, wages and working conditions required pursuant to this section and regulations"); *id.* § 1188(c)(3)(B)(iii) (requiring that the Secretary make findings to ensure that use of H-2A workers does not adversely affect workers in the United States and "promulgate, on an interim or final basis, regulations based on his findings"); *id.* § 1101(a)(15)(H)(ii)(a) (granting the Department authority to "define" the workers eligible to participate in the H-2A program); *id.* § 1188 note (referring to "regulations to be issued implementing sections [8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188]"). After considering these provisions, the *Kansas* court explained that its "reading [was] supported by the D.C. Circuit's" *Dole* decision. *Kansas* Order at *15. As with the plaintiffs in *Kansas*, Plaintiffs here offer "no

reason to depart from the D.C. Circuit's well-reasoned interpretation" that "§ 1188 affords the DOL considerable latitude to promulgate regulations that protect American workers from being adversely affected by the issuance of H-2A visas." *Id.* at *16.

Plaintiffs cite a portion of § 1188(c)(3)(A), but then attempt to cabin the provision's reach. *See* Priv. Pls.' Mot. at 8. Citing another subsection, *see id.* (citing § 1188(b)(4)[12]), Plaintiffs suggest that § 1188(c)(3)(A) serves only to "implement employers' statutory 'obligation to engage in positive recruitment' of domestic workers" before seeking H-2A workers, *id.* But that limit is not found in the text of § 1188(c)(3)(A), which speaks broadly to "terms and conditions of a job offer which meets the requirements of the Secretary" and refers to the recruitment of "eligible individuals," not of domestic workers only. And Plaintiffs' alternative reading makes no practical sense. A job order sets forth "terms and conditions" that are made available to workers in the United States and then, if not enough such workers are interested in the available positions, those same terms and conditions are offered to H-2A workers. Plaintiffs' interpretation of § 1188(c)(3)(A) would allow the Secretary to set forth such required terms and conditions insofar as the job order is used to recruit workers in the United States, but not insofar as the same job order is used—if and when recruitment efforts fall short of employer need—to recruit H-2A workers. That would upend the H-2A program, which has for decades required that a TEC application contain the same terms and conditions applicable to the employment of all potential workers. *See* 20 C.F.R. § 655.122(a) ("The employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers."); *id.* (employer must provide "to H-2A workers at least the same level of minimum benefits, wages, and working conditions that must be offered to U.S. workers"). That is why, for example, an employer must offer, advertise in their recruitment, and pay—

---

[12] This provision does not function as Plaintiffs suggest either. Subsection (b)(4) is not a generally applicable requirement regarding positive recruitment for all certifications, but instead relates to special positive recruitment requirements in designated labor surplus areas. *See* 8 U.S.C. § 1188(b)(4) (referring to a determination that an "employer has not made positive recruitment efforts within a multi-state region of traditional or expected labor supply where the Secretary finds that there are a significant number of qualified United States workers who, if recruited, would be willing to make themselves available for work at the time and place needed").

to interested workers in the United States and to H-2A workers—the highest of various wages, including the AEWR. *See* 20 C.F.R. §§ 655.120(a), 655.122(*l*); *see also supra* at 13 n.11 (describing other required terms and conditions set forth in § 655.122(f)-(k), (m)-(q)).  The Challenged Provisions similarly require that certain assurances be listed on job orders used to recruit workers in the United States as well as H-2A workers.  *See* 20 C.F.R. § 655.135 ("An employer seeking to employ H-2A workers must agree as part of the Application for [TEC] and job offer that it will abide by the requirements of this subpart [and] make each of the following assurances").

Plaintiffs wrongly assert that the Challenged Provisions do not "have anything to do with" DOL's statutory mandate to prevent adverse effects and the rulemaking authority described above. Priv. Pls.' Mot. at 9.  But DOL explained the connection throughout the Final Rule, as described above.  *See supra* at 6-7, 13-14; *see also Kansas* Order at 18-19 (citing 89 Fed. Reg. 33,991–33,992 and describing "DOL's extensive response to criticisms of the Final Rule's ability to alleviate adverse effects on American agricultural workers").  As the *Kansas* court noted, DOL explained that, "based on 'the temporary nature of [H-2A visaholder's] work, frequent geographic isolation of the [H-2A] workers, and [their] dependency on a single employer,' H-2A workers are especially vulnerable to an employer's exploitation."  *Kansas* Order at 17 (quoting 89 Fed. Reg. at 33,987).  "Additionally, because of the aforementioned vulnerabilities, H-2A employers not only exploit H-2A workers but commonly retaliate against H-2A workers who advocate for their own rights."  *Id.* (citing 89 Fed. Reg. at 33,993); *see also* 89 Fed. Reg. at 33,998.  Therefore, DOL reasonably "conclude[d]" that this "uniquely vulnerable" population is "less able and less likely to advocate on behalf of themselves or their coworkers," and accordingly, may be taken advantage of by employers far more easily that domestic workers such that "the current protections are not enough to prevent adverse effect."  89 Fed. Reg. at 33,990.  The Challenged Provisions are therefore necessary as additional "terms and conditions of a job offer which meets the requirements of the Secretary" to prevent adverse effects to workers in the United States.  *See* 8 U.S.C. § 1188(c)(3)(A)(ii).

Further, Plaintiffs wrongly contend that it is "not plausible" that the Challenged Provisions are authorized by § 1188, asserting that it cannot be that the statute permits DOL to "establish

'baseline' working conditions for H-2A workers" and then "extend those 'baseline' rules to *all* workers." Priv. Pls.' Mot. at 10. Plaintiffs mischaracterize DOL's argument and misunderstand the Challenged Provisions. These provisions do not apply to "all workers" or even to all agricultural workers. They apply only to agricultural workers in the H-2A program. These provisions therefore function like other required terms and conditions established by DOL: they must first be offered to potential U.S. farmworkers before H-2A employers can fill the open positions with H-2A workers, *see* 20 C.F.R. § 655.122(a), and any workers in corresponding employment—including U.S. workers— must receive the same "benefits, wages, and working conditions" provided by H-2A employers to H-2A employees, *see Overdevest Nurseries v. Walsh*, 2 F.4th 977, 984 (D.C. Cir. 2021) (describing corresponding employment requirements). That these provisions protect only workers employed under the H-2A program (H-2A and corresponding workers) is not unique. Rather, DOL's regulations have always required that participating employers offer and provide certain minimum terms and conditions, not otherwise required of non-H-2A employers, as a means of discouraging the exploitation of H-2A labor and thus preventing adverse effects to workers in the United States.[13] Affording these protections to especially vulnerable H-2A workers is necessary to ensure that employers do not seek to use the program to exploit the unique vulnerability of H-2A workers, which may have the effect of such employers preferring H-2A workers over domestic workers. *See, e.g., Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 790 (E.D. Mich. 2021) (describing retaliation allegations brought by H-2A workers, including threats to "sen[d] back to Mexico and blacklist[] [worker] from the H-2A program" for complaining about unpaid wages).

Finally, Plaintiffs' reliance on *Gulf Fishermens Association v. National Marine Fisheries Service*, 968 F.3d 454 (5th Cir. 2020), is misplaced. *See* Priv. Pls.' Mot. at 9. That case involved the National Marine

---

[13] The AEWR provides a simple example. The AEWR is often higher than the minimum wage non-H-2A employers may pay to agricultural workers. But requiring payment of the AEWR still prevents adverse effects for workers in the United States, including workers *not* employed under the H-2A program, "[b]y requiring that the 'employer' provide these baseline benefits, the regulations ensure that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects *for domestic workers*." *Garcia-Celestino*, 843 F.3d at 1285 (emphasis added).

Fisheries Service ("NMFS") and its administration of the Magnuson-Stevens Act, a law which establishes a framework for protecting and managing fishing and fishery resources in federal waters. *Gulf Fishermens Ass'n*, 968 F.3d at 456-57.  Based on this law, NMFS asserted the power to regulate and permit aquaculture (*i.e.*, fish farming). *Id.* at 458.  Two key distinctions make that case unlike this one.  First, NMFS "claim[ed], not that [the Magnuson-Stevens] Act affirmatively empower[ed] it to regulate aquaculture, but that the Act fail[ed] to 'express[] Congress's unambiguous intent to *foreclose* the regulation of aquaculture.'" *Id.* at 461.  Here, however, DOL is not relying on that "nothing-equals-something argument." *See id.* at 460.  Instead, DOL points to the affirmative grant by Congress to promulgate regulations to establish the baseline working conditions necessary to prevent adverse effects to workers in the United States.  Second, NMFS sought "to create an entire industry the statute does not even mention." *Id.* at 456; *see also id.* at 460 (act "say[s] nothing about creating or administering an aquaculture or fish farming regime").  Here, DOL is not creating or regulating any new industry, or expanding its reach to cover entities not otherwise covered by the H-2A program.  Instead, the Challenged Provisions represent incremental adjustments to the existing H-2A regulations and DOL promulgated them as part of its longstanding practice of setting forth requirements necessary to approve a TEC.

The Challenged Provisions build on the existing set of protected activities covered by the prior version of § 655.135(h), which already prevented employers from discriminating against workers who have "filed a complaint," "instituted" a "proceeding," "testified" "in any proceeding," "consulted with an employee of a legal assistance program or an attorney," or "exercised or asserted on behalf of themselves or others any right or protection afforded by 8 U.S.C. [§] 1188" or DOL regulations.  20 C.F.R. § 655.135(h) (effective Nov. 14, 2022); 29 C.F.R. § 501.4(a) (effective Nov. 14, 2022).  Now, going forward, that same anti-discrimination protections apply if workers engage in concerted activities for mutual aid and protection.  That is a far cry from creating (and regulating) an entirely new industry on the basis that Congress did not expressly forbid such agency action.

**d.** The major questions doctrine—even if Plaintiffs had adequately pressed such an argument[14]—would not suggest a different result. That doctrine—which is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (citations omitted)—does not apply here.

The doctrine applies when an agency makes an "unprecedented" assertion of authority to regulate a matter of vast economic or political significance. *West Virginia*, 597 at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)). Here, since 1987, DOL has consistently promulgated regulations to prevent adverse effects, including anti-retaliation and anti-discrimination provisions to facilitate a worker's rights to seek compliance with the baseline wages and working conditions required of H-2A employers. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing required anti-retaliation assurances originally promulgated at 20 C.F.R. § 655.103(g)); 1987 WHD IFR, 52 Fed. Reg. at 20,524-25 (describing anti-discrimination enforcement "deemed necessary by DOL to carry out its statutory responsibilities regarding enforcement of an H-2A employer's contractual obligations"). Far from implicating the major questions doctrine, the Department's consistent and longstanding interpretation is the type of agency interpretation entitled to respect, as *Loper Bright* confirms. *See* 144 S. Ct. at 2258.

Further, the Challenged Provisions do not rely on an "ancillary" or "previously little-used backwater" statutory provision. *See West Virginia*, 597 U.S. at 724. "To the contrary . . . the relevant grant of authority at issue here at 8 U.S.C. 1188(a) is one that the Department has long relied on to establish program requirements that ensure that the employment of H-2A workers does not adversely

---

[14] Plaintiffs do not expressly argue that this is a case that implicates the major questions doctrine. *See generally* Priv. Pls.' Mot. They do, however, cite *West Virginia v. EPA*, 597 U.S. 697 (2022), followed by the conclusory assertion that the Challenged Provisions "fundamentally realign[] the balance of regulatory power over immigration, labor, and collective-bargaining issues across an entire sector of the American economy." Priv. Pls.' Mot. at 11. Accordingly, in an abundance of caution, Defendants address the doctrine's (in)applicability here.

affect the wages and working conditions of workers in the United States similarly employed, and is an area where the Department has significant expertise."  89 Fed Reg. at 33,995; *see also* 2010 H-2A Final Rule, 75 Fed. Reg. at 6948; 2008 H-2A Final Rule, 73 Fed. Reg. 77,110, 77,159 (Dec. 18, 2008); 1987 H-2A IFR, 52 Fed. Reg. at 20,508, 20,513.  And, as discussed above, *see supra* at 10-15, the grant of statutory authority here constitutes a "broad congressional delegation" to DOL to prevent adverse effects to workers in the United States.  *Dole*, 923 F.2d at 187.  That expansive delegation looks nothing like the grants of authority at issue in major questions cases.  *See West Virginia*, 597 U.S. at 723 ("modest words," "vague terms," "subtle devices," and "oblique or elliptical language" are insufficient "in certain extraordinary cases" involving "[e]xtravagant grants of regulatory authority") (cleaned up); *see also Biden v. Nebraska*, 600 U.S. 482, 494-95 (2023) ("modify" is a "term [that] carries 'a connotation of increment or limitation,'" and must be read to mean "to change moderately or in minor fashion").

Nor can it reasonably be argued that the "sheer scope" of the agency's claimed authority makes this an "extraordinary case" to which the major questions doctrine is relevant.  *See West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159).  Unlike the agency regulations that the Supreme Court has identified as subject to the major questions doctrine, the regulations here do not seek to regulate "vast swaths of American life."  *Id.* at 744 (Gorsuch, J., concurring).  Plaintiffs mischaracterize the Challenged Provisions as "fundamentally realign[ing] the balance of regulatory power over immigration, labor, and collective-bargaining issues across an entire sector of the American economy," Priv. Pls.' Mot. at 11, but these provisions plainly do no such thing.  Instead, they revise the list of existing protected activities for which H-2A employers cannot discriminate against agricultural workers in the H-2A program.

### 2.  The Challenged Provisions Do Not Violate the NLRA.

Plaintiffs point to no provision of the NLRA that prohibits providing the Challenged Provisions to agricultural workers employed under the H-2A program.  Instead, Plaintiffs assert that these provisions violate the NLRA simply because the NLRA itself does not reach agricultural

workers.  *See* Priv. Pls.' Mot. at 13 (citing 29 U.S.C. § 152(3)).[15]  But 29 U.S.C. § 152(3), the definitional provision on which Plaintiffs rely, does not preclude any regulation of agricultural employees' interactions with their employers.  Courts have consistently held that those individuals that fall outside of the NLRA's "employee" definition may still be subject to, and protected by, other labor statutes and regulations—including those promulgated by other federal agencies.

**a.** Plaintiffs incorrectly assert that the Challenged Provisions are "an effective carbon copy of the NLRA's substantive requirements."  Priv. Pls.' Mot. at 4; *id.* at 13 (asserting that the Challenged Provisions contain the "same legal protections that Congress concluded should *not* apply to agricultural workers in the NLRA").  Plaintiffs fail to acknowledge the substantive differences between the NLRA and the Challenged Provisions.  Section 7 of the NLRA protects a covered employee's right "to self-organization, to form, join, or assist labor organizations, *to bargain collectively through representatives of their own choosing*, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157 (emphasis added).  And Section 8, among other prohibitions and requirements, bars certain "unfair labor practice[s]," including employer interference in the exercise of a covered employee's § 7 rights, and requires employers to bargain collectively with employees' representatives.  *Id.* § 158(a).

By contrast, the Challenged Provisions simply expand the H-2A program's existing anti-discrimination provisions, enforced by WHD, which expressly protect from employer retaliation workers who engage in self-advocacy and self-organization.  *See* 89 Fed. Reg. at 33,901, 34,005–06.  They do not purport to bring *any* workers within the ambit of the NLRA and do not extend the

---

[15] The "NLRA's protections extend only to workers who qualify as 'employee[s]' under [29 U.S.C. § 152(3)]."  *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 397 (1996).  That section, which defines "employee" for NLRA purposes, does "not include any individual employed as an agricultural laborer."  29 U.S.C. § 152(3).  While "[n]o definition of 'agricultural laborer' appears in the NLRA," the term "derive[s] its meaning from the definition of 'agriculture' supplied by" the Fair Labor Standards Act ("FLSA").  *Holly Farms*, 517 U.S. at 397; *see also* 29 U.S.C. § 203(f) (defining "agriculture" for FLSA purposes).  "In construing the agricultural laborer exemption," the National Labor Relations Board looks to DOL, the agency "charged with the responsibility for and has the experience of administering the [FLSA]."  *Holly Farms*, 517 U.S. at 405.

enforcement powers of the National Labor Relations Board to agricultural workers. They also "do[] not provide for collective bargaining rights," do not "grant any rights to labor organizations," and do not "compel a worker to join a union." 89 Fed. Reg. at 33,991; *see also id.* at 33,994 ("[The] rule does not require collective bargaining, employer recognition, or any other action by the employer in response to worker organizing."); *id.* at 34,005–06 (similar).[16]  Unlike the NLRA, these provisions "do[] not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities." *Id.* at 33,901.  Nor do they provide for certification or representation elections, regulate unfair labor practices, or create any kind of labor relations board or process for handling representation cases or unfair labor practice complaints as does the NLRA.

**b.** In any event, Plaintiffs point to no provision of the NLRA that prohibits or conflicts with the challenged provisions.  Rather, Plaintiffs' entire argument rests on the flawed premise that these provisions violate the NLRA because that act defines "employee" to "not include" "an agricultural laborer." 29 U.S.C. § 152(3); *see* Priv. Pls.' Mot. at 11-14.  But that definitional provision merely defines "employee" for NLRA purposes and does not state that agricultural employees are prohibited from engaging in the activities protected by the challenged provisions—and accordingly does not bar DOL from issuing the Challenged Provisions.

The room Congress left beyond the NLRA preserves for both state and federal agencies the ability to regulate a range of labor practices.  The question is whether the NLRA and the Challenged Provisions irreconcilably conflict.  And "[t]o determine whether [] tension [between a federal regulation and the NLRA] constitutes unacceptable conflict [courts] look to the extensive body of Supreme Court cases that mark out the boundaries of the field occupied by the NLRA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333–34 (D.C. Cir. 1996).  "Since the progenitors of these cases

---

[16] Similarly, 20 C.F.R. § 655.135(h) does not define or seek to prohibit unfair labor practices as do 29 U.S.C. § 158(a)(1), (2), and (3) of the NLRA.  Nor does the designation of representative provision, *see* 20 C.F.R. § 655.135(m), bear any resemblance to 29 U.S.C. § 159(a), which provides that certified representatives have exclusive rights to represent employees in collective bargaining over conditions of employment.

originally arose in the context of state actions that were thought to interfere with the federal statute, they are referred to collectively as establishing the NLRA 'pre-emption doctrine.'"  *Id.* at 1334.  "The principles developed, however, have been applied equally *to federal governmental behavior that is thought similarly to encroach into the NLRA's regulatory territory.*"  *Id.* (emphasis added); *see also UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362-63 (D.C. Cir. 2003) (applying same analysis and refusing to enjoin DOL from enforcing an Executive Order ("EO") that required certain contractors to post notices informing employees of their right not to join union on the basis that the EO did not, under the relevant "preemption" doctrines, conflict with NLRA); 89 Fed. Reg. at 33,993-94 (describing additional cases).[17]

Under these doctrines, the Challenged Provisions do not conflict with the NLRA.  *See* 89 Fed. Reg. at 33,993 (explaining why these provisions are not preempted under *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959), or *Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n,* 427 U.S. 132 (1976)).  Plaintiffs do not contest the inapplicability of the *Garmon* preemption doctrine, which "operat[es] only as to activities arguably protected or prohibited [by the NLRA], *not* to ones simply left alone, even if left alone deliberately."  *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 364 (emphasis in original).[18]  Plaintiffs argue only that *Machinists* preemption—which

---

[17]  Plaintiffs acknowledge that so-called "preemption" cases guide this inquiry.  *See* Priv. Pls.' Mot. at 12 n.2 ("Accordingly, courts routinely apply both preclusion and preemption to cases where governmental authorities regulate in ways that conflict with or augment the NLRA's substantive standards.").

[18]  Plaintiffs' choice not to argue for *Garmon* preemption is understandable given that Challenged Provisions only cover activities that the NLRA "left alone": Congress neither provided concerted activity protections to agricultural workers nor prohibited such workers from engaging in concerted activity.  The relationship between federal minimum wage law and the AEWR is similar.  Congress established the federal minimum wage when it passed the FLSA in 1938, three years after enacting the NLRA.  Fair Labor Standards Act of 1938, ch. 676, § 6, 52 Stat. 1060, 1062-63 (1938).  Most employees were covered by the FLSA's minimum wage requirement, but agricultural workers were not.  *See id.* at § 13(a)(6), 52 Stat. at 1067.  Some agricultural workers, including certain employees on small farms, family members, local hand harvest laborers, migrant hand harvest workers under the age of 16, and range production employees, continue to be excluded from the federal minimum wage, *see* 29 U.S.C. § 213(a)(6); 29 C.F.R. § 780.3, and all are still excluded from FLSA's overtime protections, *see* 29 U.S.C. § 213(b)(12).  Neither fact restricts DOL's authority, in the more limited context of the H-2A program and its adverse-effects mandate, to require H-2A employers to pay the AEWR to such workers.

preempts regulation of employer or worker conduct that Congress intended be left "unregulated and to be controlled by the free play of economic forces," *see* 427 U.S. at 144—applies here.  *See* Priv. Pls.' Mot. at 12 (describing *Garmon* and *Machinists* doctrines, but then arguing only that "[t]his case falls within the second category").  But that doctrine does not bar the Challenged Provisions.  "The *Machinists* rule creates a free zone from which all regulation, *whether federal or State*, is excluded."  *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 111 (1989) (emphasis added) (citations omitted).

Plaintiffs maintain that this doctrine bars DOL from promulgating the Challenged Provisions, arguing that there is "no doubt that regulating labor relations between agricultural workers and farm employers is contrary to Congress's intent."  Priv. Pls.' Mot. at 13.  But that argument ignores the many decisions holding that the classes of employees excluded from the NLRA's "employee" definition may still be subject to other labor protections.  *See, e.g., Villegas v. Princeton Farms, Inc.*, 893 F.2d 919, 921 (7th Cir. 1990); *UFW v. Ariz. Agric. Emp't Rels. Bd.,* 669 F.2d 1249, 1257 (9th Cir. 1982); *Willmar Poultry Co. v. Jones,* 430 F. Supp. 573, 577–78 (D. Minn. 1977) (finding no "explicit expression of a national labor policy that agricultural laborers be denied all representational rights"); *see also Chamber of Commerce v. City of Seattle,* 890 F.3d 769, 793 (9th Cir. 2018) (rejecting argument that independent contractors intended to be free of regulation "federal or local").  And those cases, as discussed above, provide the applicable conflict analysis courts use to assess the scope of a federal agency's power to regulate labor issues, which demonstrates that the challenged provisions do not conflict with the NLRA.  *See Chamber*, 74 F.3d at 1333-34; *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 362-63.[19]

---

[19] Accordingly, many states have enacted laws protecting agricultural workers engaged in various protected activities.  *See, e.g.,* Arizona Agricultural Employment Relations Act, Ariz. Rev. Stat. Ann. § 3-3101-3125; Ariz. Rev. Stat. Ann. § 23-1381-1395; California Agricultural Labor Relations Act, Cal. Lab. Code § 1153; Colorado Agricultural Labor Rights and Responsibilities Act, Colo. Rev. Stat. 8-13.5-201 (state law requiring access and employer-provided transportation to "key service providers"); New York Farm Laborers Fair Labor Practices Act (2020) (amending New York Labor Law Code §§ 701-718, Chapter 31, Article 20. Or. Rev. Stat. secs. 658.405 through 658.511 (state laws requiring licensing and bonding of agricultural recruiters).

The Challenge Provisions, therefore, do not "override" the NLRA.  *See* Priv. Pls.' Mot. at 14.  Contrary to Plaintiffs' assertions, "[t]he Supreme Court has never found that Congress intended for the NLRA to occupy the 'field' with respect to the regulation of labor concerns."  *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp. 3d 7, 25 (D.D.C. 2015); *see also id.* ("Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area.").  The NLRA's definitional provision only speaks to the reach of the NLRA; it does not set the outer bounds of labor regulation by other means.  Although the Challenged Provisions utilize terminology that carries established meaning under the NLRA, they do not purport in any way to grant collective bargaining rights or to apply the NLRA's enforcement framework to agricultural workers.  The Rule thus does not "ignor[e] the NLRA's exemption for agricultural laborers" or "bypass express congressional intent," Priv. Pls.' Mot. at 13; rather, the Challenged Provisions leave untouched the NLRA's separate provisions defining that law's scope.  The Challenged Provisions simply prohibit those employers who choose to participate in the H-2A program from retaliating against workers who engage in certain self-advocacy efforts, making employers who violate the prohibition subject to the H-2A program's enforcement mechanisms and penalties/remedies—but not to any aspect of the NLRA's distinct enforcement regime.

Finally, Plaintiffs rely on cases that address an issue not presented here: "the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014); Priv. Pls.' Mot. at 11 (citing cases).  In *POM Wonderful*, the question was whether the Federal Drug and Cosmetic Act ("FDCA") precluded private enforcement actions under the Lanham Act by one company suing its competitor for deceptive labeling practices.  573 U.S. at 106.  And in *Lollar v. Baker*, the question was whether the Rehabilitation Act precluded an enforcement action under § 1983.  *See* 196 F.3d 603, 609-10 (5th Cir. 1999).  Both cases therefore involved disputes about whether the enforcement mechanisms made available by a more general statute were available in light of the mechanisms provided for by a more specific statute.  *See id.* at 609 (assuming that "Congress intended to foreclose resort to the more general enforcement provisions of section 1983 to vindicate the rights created by the Rehabilitation Act").  Neither case

involved the question before this Court: whether an agency's regulation promulgated pursuant to one federal statute conflicts with another federal statute.  To answer that question, the proper conflict analysis is set forth above.  *See supra* at 23-25.

In any event, these cases only demonstrate why there is no conflict between the NLRA and the Challenged Provisions.  In *POM Wonderful*, for example, the Court held that the FDCA did not preclude private enforcement actions under the Lanham Act because of the differences between the two statutes.  The Court explained that the "FDCA, by its terms, does not preclude Lanham Act suits" and therefore "food and beverage labels regulated by the FDCA are not, under the terms of either statute, off limits to Lanham Act claims."  573 U.S. at 113.  So too here, where the NLRA does not "by its terms" make "off limits" labor regulation of agricultural workers.  Similarly, there is no provision that prohibits DOL "from imposing requirements that are of the type but 'not identical to'" requirements found in the NLRA.  *Id.* at 114.  And, as with the two acts at issue in *POM Wonderful*, the Challenged Provisions and the NLRA involve vastly different enforcement regimes.  *See id.* at 109, 115.  The Challenged Provisions do not extend the enforcement mechanisms of the NLRA—which provides an entire regulatory and adjudicative structure to interpret and enforce specific rights, including through a collective bargaining process—to workers in the H-2A program.  Rather, the same longstanding enforcement mechanisms that apply to an H-2A employer's failure to pay the AEWR or provide meals, transportation, housing, or meet any other obligation also apply here: only DOL may investigate and enforce the statutory and regulatory requirements.  *See* 8 U.S.C. § 1188(g)(2). Ultimately, as with the Lanham Act and the FDCA, the Challenged Provisions and the NLRA "each [have their] own scope and purpose."  *POM Wonderful*, 573 U.S. at 115.

The other cases Plaintiffs cite similarly fail to establish that there is a conflict between the Challenged Provisions and the NLRA.  *See* Priv. Pls.' Mot. at (citing *Fath v. Texas Dep't of Transp.*, 924 F.3d 132 (5th Cir. 2018) and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)).

In *Fath*, the Fifth Circuit addressed whether the state transportation department had to comply with regulations issued by the Council on Environmental Quality or those issued by the Federal Highway Administration.  924 F.3d at 136-37.  Both agencies had "regulations that govern whether

agencies may treat multiple projects as separate projects in studying their environmental impacts," but because the regulations issued by the Federal Highway Administration were specifically tailored to highway projects, the court concluded that those regulations controlled the overpass project at issue. *Id.* at 137. It is not clear how that case helps Plaintiffs here, where a single set of regulations—the H-2A regulations—apply to the conduct at issue.

And in *Brown & Williamson*, the Court rejected FDA's attempt to regulate cigarettes and smokeless tobacco primarily because otherwise the FDA would be required to ban such products— an outcome that directly conflicted with Congress's express "intent that tobacco products remain on the market." 529 U.S. at 137-39. Here, as explained, there is no direct conflict between Congress's decision not to bring agricultural workers within the reach of the NLRA itself and other federal and state regulations affecting such workers. Further, in *Brown & Williamson*, the Court explained that the seemingly broad, earlier enacted statute (in that case, the FDCA) was to be read in light of "subsequent statutes [that] more specifically address[ed] the topic at hand." *Id.* at 143. That was especially so because those later-enacted statutes "effectively ratified the FDA's long-held position that it lack[ed] jurisdiction under the FDCA to regulate tobacco products." *Id.* at 144.

None of those factors are present here. The NLRA is not a later-enacted statute; rather, it became law 50 years before Congress passed IRCA. And DOL had not previously disclaimed authority to issue the Challenged Provisions, and thus Congress did not ratify any such disavowal of the agency's authority. Instead, since 1987—on the heels of IRCA becoming law—DOL has consistently required that employers provide various assurances that they will not retaliate against workers for taking steps to ensure employer compliance with H-2A program requirements. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing assurances). The Challenged Provisions add to the list of protected activities to protect not just workers who file complaints or testify against their employers, but also those who engage in concerted activities for mutual aid and protection.

\* \* \*

28

Because § 1188 provides rulemaking authority to DOL to promulgate the Challenged Provisions, and because there is no irreconcilable conflict between those provisions and the NLRA, Plaintiffs are unlikely to succeed on the merits of Count One.

**B.  Section 655.135(h)(2)(ii)'s Prohibition of Retaliation Against Employees Who Do Not Attend Certain Meetings Does Not Burden Employers' Freedom of Speech.**

**1.  Coercion, Retaliation, and Discrimination Are Conduct, Not Speech, Thus Strict Scrutiny Does Not Apply.**

The Rule amends the H-2A regulations to provide that employers may not "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" employees who opt out of attending meetings held by employers to primarily discuss employees' protected activities under the H-2A program.  20 C.F.R. 655.135(h)(2)(ii).  This provision intends to prevent employer retaliation stemming from "captive audience meetings," which can create barriers to workers engaging in concerted activity.  89 Fed. Reg. at 34,010.  The DOL "sought to balance workers' rights to engage in (or to refrain from engaging in) concerted activity, and employers' rights to engage in speech concerning any such activity, without unduly infringing on either party's expression."  *Id.* at 34,009.  Private Plaintiffs[20] mischaracterize this provision, asserting that it "bar[s] employers from engaging in a wide range of protected expression."  Priv. Pls.' Mot. at 1.  But employers are free to express themselves however and whenever they choose.  Instead, § 655.135(h)(2)(ii) regulates conduct—namely, it "prohibit[s] employers from *disciplining* in any way an employee who fails to attend a meeting where the employer talks about [protected activities]."  Priv. Pls.' Mot. at 14 (emphasis added).

Employers' right to express their opinions on H-2A workers' protected activities is unchanged by § 655.135(h)(2)(ii).  They may continue to display posters, distribute flyers, or give speeches conveying their views.  What the Rule changes is whether employers may discriminate or take other adverse action against workers who opt not to listen to such messages in the context of particular employer-sponsored meetings.  And the government has authority to regulate such conduct.  *Thomas*

---

[20] Mississippi does not join Private Plaintiffs' First Amendment claim.

*v. Collins*, 323 U.S. 516, 540 (1945) (describing authority to regulate when alleged protected speech "free speech plus conduct").

Indeed, it is well-established that retaliatory discipline is conduct, not speech protected by the First Amendment. *See NLRB. v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) ("a threat of retaliation based on misrepresentation and coercion . . . [is] without the protection of the First Amendment."); *NLRB. v. Riley-Beaird, Inc.,* 681 F.2d 1083, 1086-87 (5th Cir. 1982) (employer's threats to employees are unprotected coercion, not protected speech). And it does not violate the First Amendment "'to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (citations omitted).[21] In such cases, the regulation's "effect on speech would be only incidental to its primary effect on conduct." *Id.*

Under the First Amendment, "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 738 (1970). Ultimately, Plaintiffs' concern is not that the government's action encumbers their free speech, it is that it supports workers' right to abstain from receiving it. *See* Priv. Pls. Mot. at 14. But "an employer's rights cannot outweigh the equal rights of the employees . . . And any balancing of those rights must take into account the economic dependence of the employees on their employers." *Gissel Packing Co.*, 395 U.S. at 617. As DOL highlighted, H-2A workers are especially vulnerable because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer." 89 Fed. Reg. at 33,987. These factors may not be exploited to force workers to listen to speech they do not wish to hear. While an employer has "a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 307 (1974) (Douglas, J. concurring) (holding that no First Amendment forum is to be found where there is "risk of imposing upon a captive audience.").

---

[21] Even regulations directly targeting speech may be permitted under the First Amendment "[w]here a single speaker communicates to many listeners . . . [and] the 'captive' audience cannot avoid objectionable speech." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 542 (1980).

Regulations aimed at employer coercion are "not in punishment of the employer but for the protection of the employees. The employer . . . is as free now as ever to take any side it may choose on [a] controversial issue." *NLRB. v. Virginia Elec. & Power Co.*, 314 U.S. 469, 477 (1941). Thus, employers are entitled to say whatever they please about the protected activities; they simply are not entitled to impose disciplinary action against their workers to ensure a captive audience. Freedom of speech carries no corollary right to a listener. *See Rowan*, 397 U.S. at 738; *Lehman*, 418 U.S. at 304.

*Sorrell v. IMS Health, Inc.* is inapposite, and Plaintiffs' conclusion that it requires strict scrutiny here is mistaken. 564 U.S. 552 (2011). *Sorrell* concerned a Vermont law that forbade sharing certain pharmacy records with pharmaceutical marketers yet allowed the information to be shared with other parties for non-marketing purposes. *Id.* at 557. The court found that pharmaceutical marketers' speech was burdened because they were denied the ability to deliver the speech they wanted: speech fully informed by the pharmacy records. *See id.* at 567 (holding that "restrictions on the disclosure of government-held information . . . burden the expression of potential recipients and so transgress the First Amendment."). But *Sorrell*'s holding concerned information-*sharing*, and the court clarified that "the First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech." 564 U.S. at 567. The only restriction § 655.135(h)(2)(ii) imposes is upon retaliation—a form of conduct. Here, the inability to discipline employees who do not attend a meeting is unlike the inability to access certain records because it is not necessary to inform employers' speech.

When the government regulates conduct and not speech, "the appropriate standard of review is simply one of whether the regulation is reasonably intended to accomplish a constitutionally permissible state objective." *Karr v. Schmidt*, 460 F.2d 609, 616 (5th Cir. 1972). This low bar is satisfied here. DOL seeks to accomplish the legitimate objective of protecting H-2A workers' rights to engage in collective action and opt out of receiving certain messaging. 89 Fed. Reg. at 34,009. Prohibiting retaliation against workers who take these actions is reasonably related to advancing this goal.

Any extent to which the retaliation restriction burdens speech, if at all, is incidental and insufficient to trigger First Amendment scrutiny. *See Virginia Elec. & Power Co.*, 314 U.S. at 478 ("[t]he

mere fact that language merges into a course of conduct does not put that whole course without the range of otherwise applicable administrative power.").

### 2.   Section 655.135(h)(2)(ii) Is Not Unconstitutionally Vague.

Plaintiffs contend that the term "primary purpose" of a meeting is too vague for them to understand what conduct is prohibited, and that the words "threaten" and "intimidate" are too "fuzz[y]" to comprehend.  *See* Priv. Pls. Mot. at 19-20.  On that basis, they assert that § 655.135(h)(2) is unconstitutionally vague.  Plaintiffs fall far short of their burden of establishing a likelihood of success on this claim.

A facial vagueness challenge should be upheld only when a provision "is impermissibly vague in all but a minuscule number of its applications."  *Home Depot, Inc. v. Guste*, 777 F.2d 1063, 1064 (5th Cir. 1985).  Vagueness arguments in employment contexts like this should be viewed skeptically since "an employer, who has control over [the employment] relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in 'brinkmanship' when it becomes all too easy to 'overstep and tumble (over) the brink.'"  *Gissel Packing Co.*, 395 U.S. at 620 (citations omitted).  In other words, when an employer calls a meeting, it knows why it did so.

In any event, the term "primary purpose" is not vague as used in the challenged provision. Rather, Plaintiffs profess their confusion with a series of what-if edge cases.  *See* Priv. Pls. Mot at 19. All of these are answered, however, by DOL's explanation of how the term will be applied: "if the 'primary purpose' of a regular 30-minute daily meeting is to discuss work assignments, but the employer changes topics and instead devotes the last 15 minutes to discussing whether workers should engage in certain protected activity, a worker would have the choice to leave that meeting at that point."  89 Fed. Reg. at 34,011.  The DOL regulations are accordingly clear—and certainly not unconstitutionally vague—about what meetings are covered and when.

Plaintiffs' vagueness claims regarding the words "threaten" and "intimidate" are similarly unpersuasive.  They attempt to draw a distinction between § 655.135(h)(2)'s language of "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" and the language

under the NLRA prohibition of "threat[s] of reprisal or force" at 29 U.S.C. § 158(c).  However, if there is any distinction to be found, it is that § 655.135(h)(2) is clearer because the challenged words it uses, "threaten" and "intimidate," are accompanied by other words that shed light on their meaning. *See Fischer v. United States*, 603 U.S. 480 (2024) ("the canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'") (citations omitted).

To get around this interpretive problem, Plaintiffs attempt to flip the burden under a facial vagueness challenge by hypothesizing about situations in which the terms might be impermissibly vague.  Pl. Mot. at 19-20.  Even if these examples were compelling—they are not—they would do little to establish that the provision "is impermissibly vague in all but a minuscule number of its applications." *Home Depot, Inc.*, 777 F.2d at 1064.  That is because in the mine run of cases in the employment context, it is clear what constitutes a threat or intimidation.  *See Gissel Packing Co.*, 395 U.S. at 616-17 (when a law's prohibitions "involve conduct easily avoided, such as discharge, surveillance, and coercive interrogation, we do not think that employers can complain that the distinctions [between protected speech and unprotected conduct] are unreasonably difficult to follow").

The provision is not unconstitutionally vague because its requirements are thoroughly explained, its use of "threaten" and "intimidate" is clarified by the surrounding words, and Plaintiffs cannot demonstrate impermissible vagueness in all but a minuscule number of applications, as required to bring a facial challenge.

## II.   Plaintiffs Have Not Established That They Are at Risk of Irreparable Harm.

To obtain emergency injunctive relief, a movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20, 22.  Plaintiffs cannot make this showing because they unreasonably delayed in filing this lawsuit and in seeking emergency relief.  "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent

urgency to the request for injunctive relief." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (citation omitted); *see also Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, No. 3:16-cv-1651-L, 2016 WL 4944370, at *16 (N.D. Tex. Sept. 16, 2016) ("Plaintiff's delay in seeking a TRO and preliminary injunction militates against the issuance of a TRO or preliminary injunction.") (citing *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975); *Pastel Cartel, LLC v. U.S. Food & Drug Admin.*, No. 1:23-cv-1010-DAE, 2023 WL 9503484, at *4 (W.D. Tex. Dec. 14, 2023) ("Courts in this District have denied preliminary injunctions due to delays shorter than the nine months here."). "[A] court's finding that the plaintiff can show a substantial likelihood of success on the merits is rebutted by a delay of even a few months in seeking preliminary injunctive relief." *Vita-Mix Corp. v. Tristar Prod., Inc.*, No. 1:07-cv-275, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (collecting cases denying injunctions based on three-, five-, and nine-month delays). Plaintiffs could have filed a lawsuit at any point after the Final Rule was published in the Federal Register on April 29, 2024. Or they could have sought to join the ongoing *Kansas* litigation as plaintiffs or intervenors. Instead, Plaintiffs sat on their rights for five months since publication of the Final Rule, waiting to sue until after the Rule took effect, and now insist that the Court issue emergency relief. The Court should not treat Plaintiffs' manufactured emergency as warranting a preliminary injunction.

Even if the Court excuses Plaintiffs' delay, there has been no showing that *each* Plaintiff is at risk of irreparable harm from *each* of the Challenged Provisions. *See infra* Part IV (explaining that the scope of relief should be defined narrowly to address the Plaintiffs' demonstrated harms); *infra* Part V (explaining that any offending provisions of the Final Rule are severable from the non-offending provisions). "[A] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *see also California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies . . . 'operate with respect to specific parties,'" not "on legal rules in the abstract." (citation omitted)).

Mississippi has not alleged—let alone established a likelihood of—any irreparable harm as to the Challenged Provisions. *See generally* Declaration of Marcus Estes, ECF No. 19-1 ("Estes Decl.").

The State joins in Private Plaintiffs' motion "except [as to] those claims and arguments pertaining to the Private Plaintiffs' First Amendment causes of action." State Pl.'s Joinder at 1. So, at most, the State is challenging 20 C.F.R. § 655.135(h) and (m).[22] But the lone declaration that the State appended to its joinder notice speaks only to harm by other, unchallenged provisions. Estes Decl. ¶¶ 7, 10 (describing alleged harms from revisions to the discontinuation provisions found at 20 C.F.R. §§ 658.501-504, which neither set of Plaintiffs has challenged); *see also id.* ¶ 6 (describing growth in use of H-2A program not attributable to Final Rule). Specifically, Mississippi alleges that the Final Rule causes the State harm because it "revises regulations that require [the Mississippi Department of Employment Security ("MDES")] to discontinue employment services to employers in certain circumstances." *Id.* ¶ 7 (citing 20 C.F.R. §§ 653.501, 658.501, which are not challenged on the merits). The declaration goes on to further describe the alleged harms from these changes to the discontinuation provisions. *See id.* ("Final Rule adds several circumstances in which MDES must discontinue an H-2A employer's employment services upon a proven violation."); *see also id.* ¶ 10 ("Final Rule imposes an immediate and increased monitoring burden on MDES, which will be required to scrutinize every H-2A visa application against a likely increasing list of debarred employers, and to begin a lengthy process to discontinue those employers' services."). But the declaration never cites or discusses § 655.135(h) or (m) or present any evidence of harms flowing from either provision. Because the State has not even alleged irreparable harm as to the Challenged Provisions, the State is not entitled to any preliminary relief.

Moreover, the State declarant's description of administrative costs fails to adequately explain how the Rule will require the State to expend its own funds on SWA's H-2A-related activities, which are funded by the federal government. The Wagner-Peyser Act requires DOL to provide congressionally appropriated grant funds to SWAs annually, and these funds are used to review H-2A job orders and carry out discontinuation of services actions, among other things. *See* 29 U.S.C.

---

[22] Private Plaintiffs do not actually present any argument on the merits as to why 20 C.F.R. § 655.135(m) should be enjoined. Accordingly, as set forth below, that provision—as well as every other unchallenged provision of the Final Rule—should be excluded from any relief that the Court enters. *See infra* Part V.

§§ 49d(a), 49e(b), 49f(a); 20 C.F.R. § 653.501; 20 C.F.R. part 658, subpart F; *see also* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Division D, Title I, 138 Stat. 460, 633 (appropriating funds for state grants under the Wagner-Peyser Act for FY2024).   The INA also authorizes funding that DOL provides to SWAs for activities related to foreign labor certification.  8 U.S.C. § 1188(g)(1); *see also* Further Consolidated Appropriations Act, 2024, 138 Stat. at 633 (appropriating funds to DOL for state grants to administer foreign labor certification activities under the INA).   And even if Mississippi could establish some *de minimis* administrative costs imposed by the Final Rule that were not covered by federal funds, such an injury would still not satisfy the irreparable harm requirement for a preliminary injunction.   A plaintiff's burden to show irreparable harm is higher than what is required to establish standing.  *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).   "For an injury to be irreparable it must be both certain and great, not merely serious or substantial."  *Kan. ex rel. Kan. Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226, 1250 (10th Cir. 2017) (internal quotation marks and citation omitted).   "Where the economic loss is irrecoverable, . . . a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be great."  *Ohio v. Becerra*, 577 F. Supp. 3d 678, 699 (S.D. Ohio 2021) (internal quotation marks and citation omitted), *aff'd in part, rev'd in part and remanded*, 87 F.4th 759 (6th Cir. 2023); *see also, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (collecting cases); *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) (similar).

### III.   The Public Interest Weighs Against a Preliminary Injunction.

The balance of hardships and the public interest also weigh against issuing an injunction here. When the government is a party, these two inquiries merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop."  *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008).  DOL determined that the Rule was in the public interest, and an injunction frustrating the enforcement of that rule would therefore harm the agency and the public interest.  Specifically, DOL found that new protections for workers employed under the H-2A program would "help

prevent exploitation and abuse of agricultural workers and ensure that unscrupulous employers do not financially gain from their violations or contribute to economic and workforce instability by circumventing the law," and that a lack of these protections "would adversely affect the wages and working conditions of workers in the United States similarly employed"—contrary to Congress's very command.  89 Fed. Reg. at 33,900.  Because the statute expressly elevates consideration of "the wages and working conditions of workers in the United States," 8 U.S.C. § 1188(a)(1)(B), DOL's Final Rule aligns with Congress's stated policy goals and is therefore in the public interest.

**IV.    Any Relief Should Be Limited to the Plaintiffs That Have Established the Requirements for a Preliminary Injunction.**

In the event that the Court finds that some Plaintiffs are entitled to relief, such relief should be limited to the Plaintiffs that have demonstrated all of the preliminary-injunction factors, including irreparable harm.  Relief should be no broader than necessary to remedy any harm demonstrated by plaintiffs in a given case.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  As explained above, *see supra* at 44-46, Mississippi has not established irreparable harm, and certainly has not established any harm as to the provisions that are challenged only by the private Plaintiffs.  So any equitable relief should extend no further than the private Plaintiffs, and only those who have established irreparable harm.[23]  Should the Court find that the private Plaintiffs have met the factors warranting preliminary relief, an injunction preventing enforcement of the Final Rule against those parties would provide complete relief to redress the parties' demonstrated actual injuries, and any broader relief would be inappropriate.  *See Gill*, 585 U.S. at 73.

The Court should reject Plaintiffs' invitation to issue nationwide relief.  "[N]ationwide injunctions or universal remedies . . . seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting

---

[23] Even if the Court finds that Mississippi has established irreparable harm as to the few provisions they challenge, any injunctive relief that extends to the State must be limited to those specific provisions they have challenged.  *See infra* Part V (explaining that the Final Rule is severable).

toward nonparties in the case. . . . Nationwide injunctions sometimes give States victories they did not earn . . . ." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 585 U.S. 667, 720 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits" (citation omitted)). As Justice Gorsuch, joined by Justice Thomas, has explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id*.; *see Kansas* Order at 34–36 (explaining why a nationwide remedy against the Final Rule is inappropriate); *see also Trump*, 585 U.S. at 713 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

Nationwide relief would be particularly problematic here given that three other district courts in different circuits are currently considering similar challenges. A nationwide injunction would render the *Kansas* Order, as well as any additional orders that might follow from other courts considering similar claims, meaningless as a practical matter. It would also preclude appellate courts from testing Plaintiffs' claims against the Final Rule's operation in other jurisdictions. Moreover, more than half of the States are not challenging the Final Rule. There is no reason why Plaintiffs' disagreements with the Rule should govern the rest of the country. *See California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) ("The detrimental consequences of a nationwide injunction are not limited to their effects on judicial decisionmaking. There are also the equities of non-parties who are deprived the right to litigate in

other forums."); *see also id.* at 582–84 (vacating nationwide scope of injunction in facial challenge under the APA).

The fact that Plaintiffs request a "stay" under the APA does not compel a different outcome. As an initial matter, the request for a stay is moot. Section 705 allows an agency to postpone the effective date of its own action pending judicial review. 5 U.S.C. § 705. And "on such conditions as may be required and to the extent necessary to prevent irreparable injury," it allows a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending" the court's review. *Id.* No postponement is available here because the effective date of the Final Rule has passed. *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022) ("While [§ 705] might authorize a Court to 'postpone the effective date' of an unlawful agency action in a particular context, the Final Rule at issue here took effect [already]."); *see also Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017). *But see All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 256 (5th Cir.) (declining to "reach a definitive answer on the question" but expressing "strong[] doubt" that a § 705 stay must be issued concurrently with an agency action), *rev'd on other grounds*, 602 U.S. 367 (2024).

In any event, § 705 does not require a nationwide remedy. *See, e.g., California*, 911 F.3d at 582–84. Section 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). No federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J., concurring). A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967), such as a court's inherent power to define the scope of relief granted. And even if the APA allows for nationwide stays in some instances, such relief is not warranted here. *See Texas v. U.S. Dep't of Labor*,

No. 4:24-cv-499-SDJ, 2024 WL 3240618, at *15 (E.D. Tex. June 28, 2024) (issuing injunction only as to State of Texas where evidence of harm was limited to that party).

**V.      If the Court Grants Relief to Plaintiffs, the Court Should Sever Any Provisions Found to Be Unlawful from the Remainder of the Final Rule.**

In the event that the Court finds that any Plaintiffs are entitled to relief, the Court should sever the provisions that it finds to be unlawful from the remainder of the Final Rule.  Plaintiffs do not raise any merits argument against most of the Final Rule's provisions.[24]   An injunction as to the unchallenged parts of the Final Rule, or to the parts for which the Court rejects Plaintiffs' challenge, would be unwarranted.  "Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)).  In the Final Rule, the Department made clear its intent that the various regulatory provisions be severable from each other, and further explained that the diverse regulatory provisions established by the Rule would function sensibly should any particular provision or provisions be invalidated.  *See* 89 Fed. Reg. at 33,952 ("The worker voice and empowerment provisions adopted in this rule, along with other provisions, provide layers of protection to prevent adverse effect, and these layers of protection would remain workable and effective at preventing adverse effect even if any individual provision is invalidated."); *id.* at 33,953 ("[T]he various protections for workers through the ES System can operate independently from the protections in [20 C.F.R.] Part 655.").  "[A]n express severability provision . . . plainly demonstrates the agency's actual intent regarding partial invalidation."  *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.*, 466 F. Supp. 3d 68, 98 (D.D.C.), *order amended on reconsideration*, 471 F. Supp. 3d 228

---

[24] *See, e.g.*, 89 Fed. Reg. at 34,048–60 (changes to effective date of the annual AEWR calculation); 20 C.F.R. § 655.122(h)(4)(ii) (requiring use of seatbelts in vehicles); 20 C.F.R. § 655.122(n) (providing definition of termination "for cause"); 20 C.F.R. § 655.135(n) (providing limited right of workers to invite guests into employer-furnished housing); 20 C.F.R. § 655.135(o) (prohibiting employers from confiscating or withholding workers' passports); 20 C.F.R. § 655.137 (requiring employers to provide certain information about foreign labor recruitment activities); 20 C.F.R. § 655.182 (modifications to debarment process); 20 C.F.R. § 658.501–04 (modifications to discontinuation process).

(D.D.C. 2020), *aff'd in part, rev'd in part and remanded*, 57 F.4th 1023 (D.C. Cir. 2023).  Accordingly, the Final Rule is severable and the Court should at most enjoin only those provisions it finds unlawful, and only as to those Plaintiffs that can satisfy the preliminary injunction factors as to each provision.

## **CONCLUSION**

The Court should deny Plaintiffs' motions for a stay or for preliminary injunction.  In the event the Court finds relief warranted for Plaintiffs, any such relief should be limited to the Plaintiffs that have established the requirements for a preliminary injunction and to the provisions found to be unlawful and causing harm to those Plaintiffs.

DATED: November 8, 2024                     Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            JULIE STRAUS HARRIS
                                            Assistant Branch Director

                                            */s/ Michael J. Gaffney*
                                            MICHAEL J. GAFFNEY (D.C. Bar No. 1048531)
                                            MICHAEL P. CLENDENEN
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, N.W.
                                            Washington, D.C. 20005
                                            Tel: (202) 514-2356
                                            Email: michael.j.gaffney@usdoj.gov

                                            *Counsel for Defendants (United States Department of Labor;*
                                            *Julie Su, Acting U.S. Secretary of Labor, in her official capacity;*
                                            *Jose Javier Rodriguez, Assistant Secretary for Employment and*
                                            *Training, U.S. Department of Labor, in his official capacity; and*
                                            *Jessica Looman, Administrator of the Wage & Hour Division,*
                                            *U.S. Department of Labor, in her official capacity)*

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2024, I electronically filed the foregoing paper with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

/s/ Michael J. Gaffney
MICHAEL J. GAFFNEY
Trial Attorney
United States Department of Justice

*Counsel for Defendants (United States Department of Labor; Julie Su, Acting U.S. Secretary of Labor, in her official capacity; Jose Javier Rodriguez, Assistant Secretary for Employment and Training, U.S. Department of Labor, in his official capacity; and Jessica Looman, Administrator of the Wage & Hour Division, U.S. Department of Labor, in her official capacity)*