## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

INTERNATIONAL FRESH PRODUCE
ASSOCIATION, *et al.*,

     *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
LABOR, *et al.*,

     *Defendants*.

No. 1:24-cv-00309-HSO-BWR

## REPLY IN SUPPORT OF THE PRIVATE PLAINTIFFS'
## MOTION FOR A SECTION 705 STAY OR PRELIMINARY INJUNCTION

Michael B. Wallace (MS Bar No. 6904)
WISE CARTER CHILD & CARAWAY, P.A.
401 E. Capitol Street (39201)
Post Office Box 651
Jackson, MS 39205-0651
mbw@wisecarter.com

James C. Simpson, Jr. (MS Bar No. 6810)
WISE CARTER CHILD & CARAWAY, P.A.
2510 14th Street, Suite 1125
Gulfport, MS 39501
jcs@wisecarter.com

*Counsel for Mississippi Farm Bureau
Federation and Stone County Farm Bureau*

Jennifer B. Dickey (*pro hac vice*)
Mariel A. Brookins (*pro hac vice*)
CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
615 H Street, N.W.
Washington, D.C. 20062
mbrookins@USChamber.com

*Counsel for Chamber of Commerce of the
United States of America*

Michael B. Kimberly (*pro hac vice*)
Paul W. Hughes (*pro hac vice*)
Connor J. Suozzo (*pro hac vice*)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, D.C. 20001
(202) 756-8901
mkimberly@mwe.com

Jonathan P. Dyal (MS Bar No. 99146)
M. Brant Pettis (MS Bar No. 101976)
Alison G. Geter (MS Bar No. 105939)
BALCH & BINGHAM LLP
1310 25th Avenue
Gulfport, MS 39501
(228) 864-9900
jdyal@balch.com

*Counsel for all Private Plaintiffs*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Introduction .......................................................................................................... 1

Reply ..................................................................................................................... 2

    A.   Plaintiffs are likely to succeed on the merits of their claims that the Rule
          exceeds the regulatory authority conferred by Congress ................................. 2

        1.   DOL's newfound statutory arguments are *post hoc* rationalizations
             incapable of sustaining the Rule ....................................................... 2

        2.   DOL vastly overreads the rulemaking power the INA confers ................ 4

        3.   The NLRA precludes the Rule ............................................................... 8

    B.   The Rule violates the private Plaintiffs' speech rights ................................. 12

        1.   Paragraph (h)(2)(ii) regulates speech, not conduct ............................... 12

        2.   The terms of paragraph (h) are vague and chill protected speech ......... 14

    C.   The remaining factors favor entry of a stay ................................................ 16

    D.   The Court should enter a Section 705 stay of the relevant aspects of the Rule ........... 17

Conclusion ......................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001)..................................................................................................11

*Alliance for Hippocratic Medicine v. FDA,*
78 F.4th 210 (5th Cir. 2023) ...............................................................................18, 19

*American Textile Manufacturing Institute v. Donovan,*
452 U.S. 490 (1981)....................................................................................................4

*Americans for Beneficiary Choice v. DHHS,*
2024 WL 3297527 (N.D. Tex. 2024)........................................................................19

*Brown & Root v. NLRB,*
333 F.3d 628 (5th Cir. 2003) ....................................................................................14

*BST Holdings, LLC v. OSHA,*
17 F.4th 604 (5th Cir. 2021) .......................................................................................6

*Building & Construction Trades Council v. Associated Builders & Contractors,*
507 U.S. 218 (1993)..................................................................................................8, 9

*Career Colleges & School of Texas v. DOE,*
98 F.4th 220 (5th Cir. 2024) .........................................................................16, 18, 20

*Chamber of Commerce of U.S. v. Brown,*
554 U.S. 60 (2008)....................................................................................................10

*Chamber of Commerce of U.S. v. City of Seattle,*
890 F.3d 769 (9th Cir. 2018) .....................................................................................11

*Checkosky v. SEC,*
23 F.3d 452 (D.C. Cir. 1994) ....................................................................................18

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971)....................................................................................................4

*DHS v. Regents of the University of California,*
140 S. Ct. 1891 (2020)................................................................................................4

*In re EPA,*
803 F.3d 804 (6th Cir. 2015) .....................................................................................19

*Florida Growers Association v. Su,*
No. 8:23-cv-889 (M.D. Fla.).......................................................................................8

*Gill v. Whitford,*
585 U.S. 48 (2018)....................................................................................................19

*Gonannies, Inc. v. Goupair.Com, Inc.,*
464 F. Supp. 2d 603 (N.D. Tex. 2006) ......................................................................16

*Home Depot, Inc. v. Guste,*
777 F.2d 1063 (5th Cir. 1985) ...................................................................................16

**Cases—continued**

*Honeyfund.com Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024) ................................................1, 12, 13, 14

*International Association of Machinists v. Wisconsin Employment Relations
Commission*,
427 U.S. 132 (1976).........................................................................................9

*Joseph Paul Corp. v. Trademark Custom Homes, Inc.*,
2016 WL 4944370 (N.D. Tex. Sept. 16, 2016).........................................16

*Kansas v. DOL*,
2024 WL 3938839 (S.D. Ga. Aug. 26, 2024) ...............................3, 11, 12

*Louisiana v.Biden*,
55 F.4th 1017 (5th Cir. 2022) .....................................................................17

*Madsen v. Women's Health Center*,
512 U.S. 753 (1994)........................................................................................19

*McCullen v. Coakley*,
573 U.S. 464 (2014)........................................................................................13

*Minnesota Voters Alliance v. Mansky*,
585 U.S. 1 (2018)............................................................................................16

*National Association of Manufacturers v. Department of Defense*,
583 U.S. 109 (2018)..........................................................................................6

*NetChoice, LLC v. Fitch*,
2024 WL 3276409 (S.D. Miss. 2024).................................................14, 15

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................18

*NLRB v. Gissel Packing Co.*,
395 U.S. 575 (1969)........................................................................................10

*NRA v. ATF*,
2024 WL 1349307 (N.D. Tex. 2024)..........................................................19

*Pastel Cartel, LLC v. FDA*,
2023 WL 9503484 (W.D. Tex. 2023)..........................................................16

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)..........................................................................................6

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)........................................................................................12

*Speech First, Inc. v. Fenves*,
979 F.3d 319, 330 (5th Cir. 2020) ..............................................................20

**Cases—continued**

*Sure-Tan v. NLRB,*
467 U.S. 883 (1984) ....................................................................9

*Sweetlake Land & Oil Co. v. NLRB,*
334 F.2d 220 (5th Cir. 1964) ........................................................9

*Teche Vermilion Sugar Cane Growers Association v. Su,*
No. 6:23-cv-831 (W.D. La.) .........................................................8

*Texas v. Becerra,*
89 F.4th 529 (5th Cir. 2024) .......................................................19

*United Farm Workers of America, AFL-CIO v. Arizona Agricultural Employment
Relations Board,*
669 F.2d 1249 (9th Cir. 1982) ....................................................11

*VanDerStok v. Black-Hawk Manufacturing Group,*
659 F. Supp. 3d 736 (N.D. Tex. 2023) .......................................17

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982) ...................................................................14

*Villegas v. Princeton Farms, Inc.,*
893 F.2d 919 (7th Cir. 1990) ......................................................11

*Vita-Mix Corp. v. Tristar Products,*
2008 WL 11383504 (N.D. Ohio 2008) .......................................16

*Wages & White Lion,*
16 F.4th at 1142 ........................................................................16

*Wages and White Lion Investments v. FDA,*
90 F.4th 357 (5th Cir.) .................................................................3

*West Virginia v. EPA,*
597 U.S. 697 (2022) .....................................................................7

*Whitman v. American Trucking Associations,*
531 U.S. 457 (2001) ..................................................................2, 7

*Yates v. United States,*
574 U.S. 528 (2015) .....................................................................7

**Statutes, Rules, and Regulations**

20 C.F.R.
§ 655.122(a) .............................................................................5
§ 655.135 .................................................................................20
§ 655.135(h)(2) ........................................................................15
§ 655.135(h)(2)(ii) ...................................................................13

5 U.S.C. § 706 ...............................................................................18, 20

iv

**Statutes, Rules, and Regulations—continued**

8 U.S.C.

§ 1188(a) .......................................................................................3
§ 1188(a)(2) ...................................................................................7
§ 1188(c)(3) ...................................................................................1
§ 1188(c)(3)(A) ...................................................................2, 3, 6, 7
§ 1188(c)(3)(B) ...............................................................................5

29 U.S.C.

§ 152(3) .........................................................................................9
§ 157 ............................................................................................10
§ 158(a)(1) ...................................................................................10
§ 158(c) .......................................................................................15

**Other Authorities**

88 Fed. Reg. 63,750 (Sept. 15, 2023) ...............................................4

89 Fed. Reg. 33,898 (Apr. 29, 2024) .........................................3, 4, 10

DOL, Announcements (Sept. 10, 2024) ............................................17

## INTRODUCTION

The Department of Labor's position in this case is stunning equally for its aggrandizement of its own power as for its lack of foundation in statutory language. Congress conferred on DOL the narrow task of establishing the technical criteria and conditions for employers to participate in the H-2A program. Aside from setting fee schedules and the like, DOL was to impose conditions on participation to ensure that the H-2A program would not have avoidable adverse effects on domestic workers. 8 U.S.C. § 1188(c)(3). DOL characterizes this as a "broad" grant of authority to promulgate virtually any regulation of the agricultural labor market (as long as it is in the name of avoiding "adverse effects" on domestic workers) and to make compliance a "condition" for participation in the H-2A program. In this case, it has invoked that power to extend NLRA-like protections to both H-2A and domestic agricultural workers.

As we demonstrated in the opening brief, that practically limitless view of DOL's rule-making power is ungrounded in the statutory text. It also conflicts with, and is thus precluded by, the NLRA, which expressly carves agricultural workers out of its scope as an essential element of the original statutory design. DOL's opposition brief doubles down on the remarkably broad interpretation of its own power—but for support, it offers mostly red herrings and non sequiturs. None of it is a basis for upholding the Rule.

The opening brief demonstrated how and why the Rule also trammels farmers' First Amendment rights. On this point, the government insists that it is only regulating conduct (employee discipline), which has only an incidental impact on speech. But courts "have rejected similar conduct-not-speech claims before" (*Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024)), and this Court should too. Here, "enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated." *Id*. at 1278. "When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Id*. Just so here. And because the government does not even attempt to satisfy strict scrutiny, there is a likelihood of success on the merits.

DOL does not directly challenge our demonstration of irreparable harm, including the significant compliance costs and burdens from which recovery is not possible. Its assertion that we waited too long between injury and motion is baseless. Plaintiffs filed just weeks after the challenged provisions took effect. And DOL has also not shown that preliminary relief would be contrary to the public interest. The Court accordingly should grant a stay.

**REPLY**

### A.    Plaintiffs are likely to succeed on the merits of their claims that the Rule exceeds the regulatory authority conferred by Congress

We demonstrated in the opening brief (at 6-14) that the Rule exceeds DOL's rulemaking power in two ways: First, it exceeds the narrow power conferred by the INA on DOL. Whatever the INA may be said to authorize, it does not empower DOL to establish NLRA-style protections for *either* H-2A *or* domestic agricultural workers. Second, the NLRA creates a comprehensive statutory scheme addressing national labor relations, and that scheme precludes DOL from promulgating, under other statutes, regulations that conflict with it.

DOL's rejoinders are not persuasive. For one thing, it has invented a new legal justification for the Rule in the course of the litigation, which it may not do. Beyond that, the agency offers no meaningful limit on its own view of its power. Its approach is thus indefensible—Congress "does not . . . hide elephants in mouseholes" like this. *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).

### 1.    DOL's newfound statutory arguments are *post hoc* rationalizations incapable of sustaining the Rule

**a.** DOL repeatedly takes the position that § 1188 contains a "clear and broad statutory command," gives it "broad authority," and constitutes a "broad congressional delegation" of power for sweeping regulation of the agricultural labor force. *See* DOL Opp. 1, 5, 10, 15, 21. But the agency's explanation for such broad powers has been a moving target. Here in this Court, its newfound source of authority for the Rule is 8 U.S.C. § 1188(c)(3)(A), which it reads as granting

seemingly limitless power to promulgate any "criteria," or "terms and conditions," or "requirements" for participation in the H-2A program.

Set aside for the moment the merits of that position (which are dubious), and consider first that DOL has never before invoked 8 U.S.C. § 1188(c)(3)(A) as the conceptual foundation for its authority to promulgate the Rule. In the preamble to the Rule—an enormous document well exceeding 170 pages and 190,000 words—DOL cited § 1188(c)(3)(A) just three times, and never as the statutory lynchpin for its action. Instead, DOL's position in the preamble was that "the relevant grant of authority at issue here [is] 8 U.S.C. 1188(a)," which "is one that the Department has long relied on to establish program requirements." DOL Opp. 20-21 (quoting 89 Fed. Reg. 33,898, 33,995 (Apr. 29, 2024)).

It was not until a decision was issued in *Kansas v. DOL*, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024), which relied extensively on § 1188(c)(3)(A), that DOL began citing the provision as the most important among the many subsections of § 1188. In this case, for the first time, DOL takes the position that "[t]he statute as a whole, *and § 1188(c)(3) in particular*, vests the Secretary with authority to issue regulations governing the terms and conditions of employment under the program." DOL Opp. 12 (emphasis added).

The late-breaking nature of this position is problematic for two reasons. **First**, a federal agency engaged in such consequential rulemaking should have clear and firm statutory footing for doing so. To be casting about in search of statutory authority months after the rulemaking has concluded plainly calls into doubt the strength of the agency's position. **Second**, if DOL truly believed that § 1188(c)(3)(A) were the core source of its rulemaking power, it was required to say so during rulemaking so that it might receive comment on that position and earn the right to defend it in court. "[C]ourts may not accept [an agency's] counsel's *post hoc* rationalizations for agency action" raised in post-rule litigation; the agency's action instead "must be upheld, if at all, on the basis articulated by the agency itself" in the rulemaking proceedings. *Wages and White Lion Investments v. FDA*, 90 F.4th 357, 372 (5th Cir.) (en banc), *cert. granted*, 144 S. Ct. 2714 (2024).

To be sure, DOL did cite § 1188(c)(3)(A), but only as authority to regulate H-2A recruitment, and thus only as support for "new disclosure requirements to enhance foreign worker recruitment chain transparency." 88 Fed. Reg. 63,750, 63,802 (Sept. 15, 2023). It was for that same requirement the DOL cited the provision in the final preamble. *See* 89 Fed. Reg. at 34,025.

It is too late in the game for DOL to be making new arguments in defense of the Rule. *See, e.g.*, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971); *American Textile Manufacturing Institute v. Donovan*, 452 U.S. 490, 539 (1981); *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1908-1909 (2020).

## 2.    DOL vastly overreads the rulemaking power the INA confers

**a.** On its own terms, DOL's newfound position is unsustainable. DOL reasons that § 1188(c)(3) empowers it to promulgate regulations setting "terms and conditions of employment" under the H-2A program, including terms and conditions deemed necessary to ensure that the program does not adversely affect domestic agricultural workers. DOL Opp. 12. "In issuing these regulations," DOL continues, it "has historically understood the INA's adverse effect requirement as (1) establishing a baseline acceptable standard for working conditions below which workers in the United States would be adversely affected and (2) requiring parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer." *Id*. (cleaned up). DOL's logic thus appears to be that if working conditions are poorer (and, by implicit assumption, less expensive) for H-2A workers, domestic workers will be adversely affected as their working conditions are pulled down with those of H-2A workers in a race to the bottom.

DOL then attempts to apply this (empirically unsupported) reasoning in context. It asserts that "for [non-H-2A] agricultural workers in the United States to meaningfully be able to assert their rights and advocate regarding wages and working conditions, their H-2A program counterparts must be able to do the same." DOL Opp.  14. After all, DOL reasons, "[i]f employers could turn to the relatively captive and vulnerable H-2A workforce to undermine efforts by workers in

the United States to advocate about wages and working conditions, the H-2A program would directly have an adverse effect on those workers in the United States." *Id*. This necessitates new NLRA-like protection of H-2A employees' efforts to organize. *Id*.

That reasoning is faulty for two reasons.

***First***, § 1188(c)(3)(B) specifies that H-2A workers may "not be admitted under this section unless there are not sufficient workers in the United States" that are willing, able, and qualified to meet farmers' labor needs. The premise of DOL's reasoning is thus mistaken: Farmers *cannot* "turn to the relatively captive and vulnerable H-2A workforce" in place of "workers in the United States" in an effort to undermine domestic agricultural workers' union advocacy—at least not unless there is a demonstrated shortage of domestic workers, in which case farmers would have to turn to H-2A workers either way. If DOL has concern that farmers are improperly supplanting domestic workers with H-2A workers because H-2A workers are less likely to organize, the answer is to step up enforcement of § 1188(c)(3)(B), not for DOL to promulgate an unauthorized rule. Certainly, nothing in the text of § 1188(c)(3)(A) suggests that DOL has authority to attempt to address the issue by extending additional, extra-statutory protections to H-2A workers (and then also domestic workers) not afforded ex ante to domestic workers.

***Second***, the Rule is in any event the *inverse* of the kind of rulemaking that DOL says that § 1188(c)(3) authorizes. The Rule does not extend protections enjoyed by domestic workers to H-2A workers, thus leveling the playing field to prevent a race to the bottom. It does the opposite: It extends to H-2A workers NLRA-like rights and protections that domestic agricultural workers *expressly are denied* under the NLRA. DOL thus asserts power to put H-2A workers in a more favored position vis-à-vis the right to organize, as compared with domestic workers. That would be contrary to the agency's own prior regulations, which specify that farmers may not give H-2A workers preferential treatment with respect to working conditions. *See* 20 C.F.R. § 655.122(a). The Rule thus purports to fix the imbalance (to establish "parity") across H-2A and domestic workers by extending the same protections that it created for H-2A workers to domestic workers

of H-2A employers (leaving domestic workers of non-H-2A employers unprotected).

Even taking DOL's reading of § 1188(c)(3) at face value, the provision does not authorize an upside-down regulation of this kind. The Rule does not protect domestic laborers by leveling the playing field—the status quo ante was already level for H-2A and domestic workers, inasmuch as neither was granted protections under the NLRA. DOL may disagree with Congress's policy choice on that front. But § 1188(c)(3) cannot be read as an open-ended grant of power to reverse it. The absence of NLRA-like rights and protections in the agricultural sector is a consequence of Congress's judgment in the NLRA itself, not the presence of H-2A workers on the farm.

**b.** In suggesting otherwise, DOL vastly overreads its authority under § 1188(c)(3)(A). That narrow provision requires the Department to issue employment certifications to farmers who have "complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)" when the employer has extended "a job offer which meets the requirements of the Secretary" to qualified domestic workers.

DOL takes the view that § 1188(c)(3)(A)'s text implies it has power to set whatever "criteria for certification" to participate in the H-2A program by regulation it likes, according to whatever it believes is good policy as a matter of general labor relations. That is not what the text says—it says in the parenthetical that the Secretary of Labor may "prescribe[]" criteria only for "the *recruitment of eligible individuals*." 8 U.S.C. § 1188(c)(3)(A) (emphasis added). The reference to "criteria for certification" preceding the parenthetical does not include the same modifier, "as prescribed by the Secretary," indicating that it is a reference to the statutory criteria alone. Were it otherwise, the words "as prescribed by the Secretary" in the parenthetical would be surplusage. But a court is "obliged to give effect, if possible, to every word Congress used. *National Association of Manufacturers v. Department of Defense*, 583 U.S. 109, 128-129, (2018) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

Moreover, the best meaning of that language must be determined in context. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 613 (5th Cir. 2021) ("To avoid giving unintended breadth

to the Acts of Congress, courts rely on the principle of *noscitur a sociis*—a word is known by the company it keeps.") (cleaned up) (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)). Here, context suggests a limited and essentially ministerial role for DOL. For example, among the "requirements" it may impose for certification are "the payment of a fee to recover the reasonable costs of processing applications for certification." 8 U.S.C. § 1188(a)(2).

But DOL's position is far broader, insisting that it may establish virtually any condition or requirement for employment to stave off anything it believes may have an "adverse effect" on domestic agricultural laborers, no matter the cause. That position, if credited by the Court, would convert the Department into a general agriculture-labor-market regulator with near limitless rule-making power. There would be nothing, for instance, to stop DOL from concluding that it may promulgate "criteria for certification" (8 U.S.C. § 1188(c)(3)(A)) that include an assurance that employers will bargain collectively with employees' representatives, fully overriding the NLRA. And DOL's expansive notion of its rulemaking power would not stop at labor regulations. It could just as well determine that criteria for certification should include an assurance that employers will stop using certain pesticides or convert their internal-combustion-engine machines to electric ones, to reduce the adverse effects on domestic workers of environmental exposures. (If farmers could force H-2A workers to accept such exposures, DOL would say, they would be less likely to afford such protections to domestic workers.) The theory is truly without limit.

The idea that Congress meant to confer such unbounded rulemaking power on DOL with respect to an immigrant visa program is simply untenable. If that had been Congress's intent, it would have given a clear and express indication of that purpose. *West Virginia v. EPA*, 597 U.S. 697, 732 (2022). Congress does not settle "the fundamental details of a regulatory scheme in vague terms or ancillary provisions" like this. *Whitman*, 531 U.S. at 468. DOL's position "ultimately founder[s] upon that principle." *Id*.

**c.** It is no answer to observe that DOL has previously "promulgated regulations to prevent adverse effects, including anti-retaliation and antidiscrimination provisions to facilitate a worker's

rights to seek compliance with the baseline wages and working conditions required of H-2A employers." DOL Opp. 20. It is one thing to promulgate regulations to ensure "wages and working conditions" for H-2A workers are *up to the same standards as* those for domestic workers, so domestic workers are not pulled down. (We note, however, that DOL's reasoning even in that respect lacks evidentiary support, and the outer boundaries of that power are currently subject to multiple legal challenges. *See Florida Growers Association v. Su*, No. 8:23-cv-889 (M.D. Fla.); *Teche Vermilion Sugar Cane Growers Association v. Su*, No. 6:23-cv-831 (W.D. La.).)

In any event, this case is not about raising the "wages and working conditions" of H-2A employees upward to *match* those of domestic workers—it is about raising them *above* those of domestic workers, and then remarkably asserting the need to raise those of domestic workers to match H-2A workers. That is the inverse of DOL's asserted rulemaking power.

DOL thus cannot defend the Rule as merely an "incremental adjustment" to preexisting regulations, accomplishing nothing much to note. DOL. Opp. 19-21. In the near-century since the NLRA was enacted, and in the nearly four decades since the H-2A program was established, agricultural workers have never had anything close to the labor-organization protections that the Rule purports to extend. And agency action that regulates agriculture, immigration, and unionization in novel and disruptive ways bears extraordinary political and economic significance. This is a stark break from past practice, not a continuation of it.

### 3.    The NLRA precludes the Rule

**a.**  Not only does the Rule exceed DOL's delegated statutory authority under the INA, but it is precluded by the NLRA. As we explained in the opening brief (at 11-14), the NLRA prevents "all regulations, whether state or federal" within "a protected zone, whether it be a zone protected and reserved for market freedom or for NLRB jurisdiction." *Building & Construction Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 226-227 (1993). Thus, where the NLRA left areas "to be controlled by the free play of economic forces," neither "state [n]or federal" entities may introduce new protections or prohibitions in those areas. *Id.* at 225-226. In short, the

NLRA's "comprehensive federal law of labor relations," including the area left *un*regulated, "is not to be frustrated." *International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 155 (1976). Although DOL picks nits with the various cases we cited for these propositions, it does not (and cannot) disagree with the basic principle that an agency cannot promulgate regulations under one statute in a manner that overrides the clear congressional judgments reflected in another statute.

In response, DOL asserts that preclusion does not apply because the Rule is not a "carbon copy" of the NLRA, in that the NLRA accomplishes more than the Rule. Beyond merely establishing bans on adverse employment actions in response to unionization efforts, the NLRA established collective bargaining requirements and a scheme for handling administrative complaints. DOL Opp. 22-23. But that is a red herring. A federal regulation does not have to match a preclusive statute provision-for-provision to fall under the preclusion doctrine. It is enough to introduce new protections or prohibitions in the same regulatory field as the preclusive statute, in a manner that is inconsistent with the policy judgments reflected in the statute. *Building & Construction*, 507 U.S. at 224-225.

**b.** As we showed (Opening Br. 13), that is the case here. Despite the NLRA's "striking" breadth of application to "any employee" (*Sure-Tan v. NLRB*, 467 U.S. 883, 891 (1984)), Congress deliberately elected to "exclude from its coverage 'any individual employed as an agricultural laborer'" (*Sweetlake Land & Oil Co. v. NLRB*, 334 F.2d 220, 221 (5th Cir. 1964) (quoting 29 U.S.C. § 152(3))). This is not a case in which the NLRA passively "does not reach agricultural workers" (DOL Opp. 21-22)—rather, the "specifically enumerated exception[]" was a part of Congress's express legislative design. *Sure-Tan*, 467 U.S. at 891.

And yet, the Rule extends NLRA-like protections to agricultural workers anyway, even using "terminology that carries established meaning under the NLRA." DOL Opp. 26. The Rule gives agricultural workers the right to engage in "'concerted activity for mutual aid and protection,' which encompasses numerous ways that workers can engage, individually or collectively, to

enforce their rights." 89 Fed. Reg. at 34,005. The NLRA, in close comparison, protects employees' right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection" (29 U.S.C. § 157). The Rule states that H-2A employers may not "discharge, or in any manner discriminate against . . . any person who has engaged in activities related to self-organization," including "any effort to form, join, or assist a labor organization." 89 Fed. Reg. at 34,062. The NLRA similarly provides that employers may not "interfere with, restrain, or coerce employees in the exercise of the[ir] rights" (29 U.S.C. § 158(a)(1)), including rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through represen-tatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" (*id*. § 157).

More broadly, the NLRA carefully balances the rights of both employees and employers to advocate and speak in the workplace. The act's plain text "demonstrate[s] that when Congress has sought to put limits on advocacy for or against union organization, it has expressly set forth the mechanisms for doing so." *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 68 (2008) ("Congress' express protection of free debate [in the NLRA] forcefully buttresses the pre-emption analysis in this case."). Among other things, the act "expressly precludes regulation of speech about unionization 'so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Id*. (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)). Thus, DOL's "judgment that partisan employer speech necessarily 'interfere[s] with an employee's choice about whether to join or to be represented by a labor union,'" is "unequivocally pre-empted" (or in this case, precluded) by the NLRA. *Id*. at 69.

**c.** As a fallback, DOL argues that none of this matters. In its view, it remains free to regulate labor relations—even in a manner that perfectly mimics the NLRA—without regard for the "classes of employees excluded from the NLRA's" scope. DOL Opp. 25. In other words, if the NLRA left a sector of the economy uncovered, that's really just Congress's invitation for DOL to search out, in the interstices of other statutes, the power to regulate where Congress concluded the

NLRA should not. DOL unsurprisingly cannot cite any Supreme Court or Fifth Circuit cases for that remarkable proposition. Instead, it relies (at 25) on mostly stale Seventh and Ninth Circuit cases for the point. But none supports its position.

In *Villegas v. Princeton Farms, Inc.*, 893 F.2d 919 (7th Cir. 1990), the parties simply agreed that the NLRA did not preempt Illinois's retaliatory discharge laws. *See id.* at 921. And in *United Farm Workers of America, AFL-CIO v. Arizona Agricultural Employment Relations Board*, 669 F.2d 1249 (9th Cir. 1982), the Ninth Circuit concluded that Arizona could regulate union elections for agricultural workers. But the court there focused on "our constitutional system of cooperative federalism," stressing that "Congress's exclusion of agricultural employees from the Act" invited *state* legislation to fill gaps left by Congress. *Id.* at 1257. That reasoning has no place with respect to preclusion, where cooperative federalism is not at play and agencies cannot infer vast rulemaking power from ambiguities in one statute, where Congress expressly denies the power in another statute. The same goes for *Chamber of Commerce of U.S. v. City of Seattle*, 890 F.3d 769 (9th Cir. 2018), where the court suggested the agricultural carveout may not preempt state laws, using the same preemption-specific reasoning inapplicable to preclusion scenarios.

Unlike those other cases, "[t]his case does not present the question of whether states may constitutionally enact laws protecting the collective bargaining rights of agricultural workers within their boundaries." *See Kansas*, 2024 WL 3938839, at *8. "Instead, this case presents the question of whether an administrative agency can create a right that Congress has not," and that it deliberately has withheld. *Id.* "The answer is no." *Id.*

DOL's contrary position is that it is free to disregard Congress's express and deliberate decision to exclude agricultural workers from the NLRA's scope. As DOL sees the matter, it may promulgate regulations under an unrelated immigration statute, extending NLRA-like protections to override the balance struck by Congress. Again, that is not the law. "Language in a regulation . . . may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). Here, "the Final Rule provides for agricultural workers' right to participate in concerted activity

to further their interests," which "is a right that Congress has not created by statute." *Kansas*, 2024 WL 3938839, at *8. Because DOL has "not provided any source indicating that Congress intended to create such a right," and because the NLRA plainly indicates the opposite intent, the Rule is precluded by the NLRA and must be vacated. *Id.*

### B.    The Rule violates the private Plaintiffs' speech rights

We demonstrated in the opening brief (at 14-20) that the Rule both restricts speech without satisfying strict scrutiny and burdens other speech using vague terms that are certain to chill protected expression. These serious constitutional concerns are further reason Plaintiffs are likely to succeed on their First Amendment claim and obtain vacatur.

#### 1.    Paragraph (h)(2)(ii) regulates speech, not conduct

Paragraph (h)(2)(ii), concerning mandatory employee meetings, is a content-based, speaker-based speech restriction that fails strict scrutiny. It is thus unlawful in all its applications and must be vacated on its face. *See* Opening Br. 14-18.

DOL's primary response to this line of argument is that paragraph (h)(2)(ii) regulates conduct, not speech. All it does is prohibit employers from "discriminat[ing] or tak[ing] other adverse action against workers who opt not to listen to [employers' opinions on unions] in the context of particular employer-sponsored meetings." DOL Opp. 29. And "retaliatory discipline is conduct, not speech protected by the First Amendment." *Id.* at 30.

That is a mere sleight of hand. Buying ink is conduct, too, but a law that bans disfavored media companies "from purchasing or using ink" plainly "imposes a speaker- and content-based burden on protected expression," thus "justify[ing] application of heightened scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). The same holds true here, as the Eleventh Circuit recently explained in *Honeyfund.com*, 94 F.4th at 1272. Florida there, like DOL here, sought "to bar employers from holding mandatory meetings for their employees if those meetings endorse viewpoints the state [found] offensive." *Id.* at 1275. There, like here, mandatory meetings were permissible if they addressed topics inoffensive to the state. *Id.* And there, like here, the state

argued that "ordinary First Amendment review does not apply because the law restricts conduct, not speech." *Id*. But the court rejected the state's "attempt to control speech by recharacterizing it as conduct." *Id*.

In reaching that conclusion, the Eleventh Circuit laid out how "to distinguish between" conduct and speech "[w]hen the conduct-not-speech defense is raised." *Id*. at 1278. The simplest way "is to ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated." *Id*. (quoting indirectly *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)). "In other words, [the Court must] ask whether the message matters, or just the action." *Id*. Here, it is the message that matters—*not* the action.

The government does not deny that an employer may require employees to attend paid-time meetings as a condition of employment. It therefore does not deny that an employer generally may discipline employees for refusing to attend such meetings. Nor does the government disagree that, under the Rule, an employer may make attendance at such a meeting mandatory—that is, it may make refusal to attend the basis for adverse employment action—when the purpose of the meeting is to convey the employer's opinion on topics other than unionization. Further, DOL does not deny that an employer may require attendance at a meeting under the Rule even when "the primary purpose" *is* to communicate an opinion on unionization, as long as it isn't the employer's opinion. *See* 20 C.F.R. § 655.135(h)(2)(ii).

The one and only thing that the Rule forbids an employer from doing in this regard is to enforce mandatory attendance at a meeting when "the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by" the Rule. 20 C.F.R. § 655.135(h)(2)(ii) (emphasis added). On its face, that is a content-based and speaker-based restriction of speech, not conduct—the only way "to know whether the [Rule] has been violated" is by "examin[ing] the content of the message that is conveyed" and who conveyed it. *Honey-fund.com*, 94 F.4th at 1278.

The Rule is clear on this. If an employer avoids discussing unionization at mandatory employee meetings, it may discipline non-attendance without fear of government penalties. But if the employer shares an opinion on unionization, any enforcement of a mandatory-attendance rule becomes illegal. The government assuredly cannot condition regulatory restrictions of "conduct" on the content of the messages or opinions that a regulated person conveys. "[H]iding speech restrictions in conduct rules is not only a dubious constitutional enterprise—it is also a losing constitutional strategy." *Id.* "When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech," which therefore must be treated "just like any other content-based speech restriction under the First Amendment." *Id.* And as we demonstrated in the opening brief, "an employer's free speech right to communicate his view to his employees is firmly established and cannot be infringed." *Brown & Root v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003).

All of that being so, Plaintiffs are likely to succeed on their claim that paragraph (h)(2)(ii) violates the First Amendment and must be vacated. DOL does not even attempt to justify the restriction under the strict scrutiny framework. Nor could it, for all the reasons given in the opening brief (at 15-18).

### 2.    The terms of paragraph (h) are vague and chill protected speech

**a.**  We showed also that the Rule prohibits speech with terms too vague for farmers to know what is prohibited. *See* Opening Br. 18-20. Paragraph (h)'s ban on meetings with a "primary purpose" to share opinions about organizing, and on "intimidat[ion]" and "threat[s]," are fuzzy concepts that will chill a wide range of protected speech. And "the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at \*15 (S.D. Miss. 2024) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* (quoting same).

DOL asserts that any ambiguity in the meaning of "primary purpose" is resolved by the preamble to the Rule, which suggests that the "primary purpose" of a meeting can shift, so that an employee may be required to attend the first part of a meeting but not the second part, as the topic changes to unionization. DOL Opp. 32. But that is not what 20 C.F.R. § 655.135(h)(2) says; rather, it prohibits making attendance mandatory at "an employer-sponsored meeting . . . if *the* primary purpose of *the* meeting is to communicate the employer's opinion concerning" organization. That language indicates a single "primary purpose" for "the" meeting, not multiple primary purposes that change from time to time, as though a single meeting were really multiple meetings stitched together. And when the purpose of "the" meeting is to discuss organizing, it relieves employees of any obligation to attend "the" meeting, start to finish.

Even taking DOL's supposed "clarification" at face value, it still would be unclear when the current primary purpose of a meeting is for the employer to share an opinion on organizing. Regardless whether it applies to a meeting in toto or piecemeal, the Rule does not "provide any guidance as to when" an employer's discussion of labor unions is "merely 'incidental' to [the] purpose [of a meeting], as opposed to being [its] primary" purpose. *NetChoice*, 2024 WL 3276409, at *15. We made this point in the opening brief (at 19), but DOL ignored it.

**b.**  We also showed (Opening Br. 19-20) that the terms "threaten" and "intimidate" are too vague for First Amendment purposes. Under the Rule, these terms are far broader and fuzzier than the standard established by the NLRA, which prohibits only "threat[s] *of reprisal or force*." 29 U.S.C. § 158(c) (emphasis added). Without that limiting language, the Rule's speech ban is hope-lessly unclear—employers cannot know when, how, or in what ways their expression of opinion on unions might be taken as threatening or intimidating. Is it so for an employer to tell an employee that she thinks unions are "bad policy" or "counterproductive"? What if she says they are "corrupt" or "illegitimate"? "Harmful" or "stupid"? There is no way to know.

DOL insists otherwise, asserting without a word of explanation that any lack of clarity concerns only "a minuscule number of [the Rule's] applications." DOL Opp. 33. But in taking that

bald and unsupported position, DOL quotes from *Home Depot, Inc. v. Guste*, 777 F.2d 1063, 1064 (5th Cir. 1985), which was not a First Amendment case. In the First Amendment context, "an indeterminate prohibition" with "the potential for erratic application" is fatal. *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 21 (2018). No matter how "evenhanded" DOL regulators may strive to be, their discretion in enforcing the Rule against statements that are subjectively perceived to be threatening or intimidating simply cannot be "guided by objective, workable standards." *Id*. The Rule accordingly violates the First Amendment. *Id*.

**C.    The remaining factors favor entry of a stay**

**1.**    As we explained in the opening brief (at 20-21), plaintiffs and their members will suffer irreparable harm without a stay. "[C]omplying with [an agency rule] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Wages & White Lion*, 16 F.4th at 1142. Such costs include those occasioned by "necessary alterations in operating procedures" to achieve compliance and "immediate threats of costly and unlawful adjudications of liability." *Career Colleges & School of Texas v. DOE*, 98 F.4th 220, 235 (5th Cir. 2024).

DOL's response is to say the plaintiffs unreasonably delayed their request for relief. But the delay here was hardly lengthy. The Rule first covered H-2A petitioners whose applications were filed on or after August 28. Plaintiffs filed suit only slightly more than one month later, on October 8, filing the motion for a stay just nine days following that, on October 17. That is a far cry from the many-months-long delays at issue in the cases cited on page 34 of DOL's opposition brief. *See Pastel Cartel, LLC v. FDA*, 2023 WL 9503484, at *3 (W.D. Tex. 2023) (plaintiff "waited ten months before seeking a preliminary injunction"); *Joseph Paul Corp. v. Trademark Custom Homes, Inc*., 2016 WL 4944370, at *16 (N.D. Tex. Sept. 16, 2016) ("unexplained and undue delay of approximately six months"); *Vita-Mix Corp. v. Tristar Products*, 2008 WL 11383504, at *8 (N.D. Ohio 2008) ("eleven-month delay in seeking the extraordinary remedy of injunctive relief"); *Gonannies, Inc. v. Goupair.Com, Inc*., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (delay of seven-and-a-half months from injury to motion for a preliminary injunction).

16

Moreover, there was good reason for a modest delay: The Southern District of Georgia had entered a preliminary injunction on August 26, and initial indications were that DOL might abide by that injunction nationwide in light of the logistical difficultly of enforcing the Rule in geographically variable ways. It was not until September that it became evident that DOL would not comply with the order in *Kansas* on a nationwide basis, necessitating this motion. *See* Opening Br. 6 (citing DOL, Announcements (Sept. 10, 2024), https://perma.cc/M3LX-BVQA). In all events, a total delay of less than two months from effective date to motion is entirely reasonable.

**2.**   On the question of the balance of hardships and the public interest, DOL does not deny that "there is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v.Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). Its only substantive response is to say that the Rule protects the interest of agricultural workers. DOL Opp. 36-37. But even supposing that were true (it is not), there is no public interest in such protections if the agency promulgating them has violated "the federal laws that govern [its] existence and operations" to do so. *VanDerStok v. Black-Hawk Manufacturing Group*, 659 F. Supp. 3d 736, 744 (N.D. Tex. 2023). Ultimately, the public interest question boils down to the merits: If the Court agrees that we have succeeded in showing a likelihood of success on the merits, then perforce there is no public interest in continued enforcement of the Rule.

### D.    The Court should enter a Section 705 stay of the relevant aspects of the Rule

DOL argues that the Court should enter only party-specific relief rather than a general Section 705 stay of the Rule. On this score, it asserts (at 38) that "nationwide relief" would be "problematic" because other suits are pending in which other courts have been asked to enter injunctive relief. But there is nothing problematic about relief being granted by one court, in turn obviating the need for relief granted by another court—that happens every day. Nor would there be anything "inconsistent" (DOL Opp. 38) between a Section 705 stay in this case and the preliminary injunction in the *Kansas* case. Both would work to preserve the status quo.

What is truly problematic is the patchwork-approach that DOL is now following in the wake of the *Kansas* injunction. As we noted in the opening brief (at 23), the complex arrangements involving thousands of parties across the H-2A program makes party-specific relief practically unmanageable, especially for multistate businesses that have operations that span state lines. See Chamber Decl., Ex. 4, ¶ 10. DOL offers no response to this critical point.

We explained further in the opening brief (at 23) that a stay that runs against the Rule itself avoids the separation-of-powers tensions that arise when a court enters an injunction that runs coercively against a federal official. A stay preserves the status quo ante "by temporarily suspending the source of authority to act" rather than "by directing an actor's conduct." *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024) (quoting *Nken v. Holder*, 556 U.S. 418, 428-429 (2009)). Thus, in contrast "with a preliminary injunction, a stay does not actively prohibit conduct, and so does not carry the same threat of contempt." *Id*. DOJ again does not respond.

A stay is also appropriate as a general matter in APA cases because "[i]n the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay is the temporary form of vacatur," which is the relief mandated by 5 U.S.C. § 706. *Hippocratic Medicine*, 78 F.4th at 254. The substantive claims in this case are facial challenges; the unlawfulness of the Rule does not depend on the facts or circumstances of those against which it is applied. If, as we argue, the Rule exceeds DOL's rulemaking authority or restricts speech based on its content without satisfying strict scrutiny, then it is necessarily unlawful on its face—meaning that it is unlawful in the same way, for the same reasons, in every case.

That is typically so for APA cases, which is why "[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be [party] limited." *Career Colleges*, 98 F.4th at 255. On the contrary, the APA's "command [is] that the reviewing court 'shall' 'set aside' arbitrary and capricious agency action," meaning that a court "[has] no choice but to vacate" when entitlement to relief is shown. *Checkosky v. SEC*, 23 F.3d

452, 493 (D.C. Cir. 1994) (opinion of Randolph, J.); *accord Career Colleges*, 98 F.4th at 255 ("ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action").

DOL ignores the APA cases we cited for these propositions, instead pointing to non-APA cases involving generally requests for preliminary injunctions in unrelated constitutional cases. *See* DOL Opp. 37 (citing *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (partisan gerrymandering case); *Madsen v. Women's Health Center*, 512 U.S. 753, 765 (1994) (abortion rights case). Those authorities have no relevance to Section 705 stay motions in APA cases.

DOL next argues (at 39) that a Section 705 stay is no longer possible because the Rule already has come into effect. Government agencies routinely make that argument, and so far as we are aware, courts always reject it. *See, e.g.*, *In re EPA*, 803 F.3d 804, 808 (6th Cir. 2015) (granting a Section 705 stay of a regulation where the effective date had passed, "to restore the status quo as it existed before the Rule went into effect"); *Americans for Beneficiary Choice v. DHHS*, 2024 WL 3297527, at *7 (N.D. Tex. 2024) ("a section 705 stay does not need to be issued concurrently with agency action"); *see also Hippocratic Medicine*, 78 F.4th at 255-56 (expressing doubt that section 705 should be limited to "contemporaneous agency actions"). As DOL notes (at 39), a stay is an equitable remedy, and courts may stay agency rules any time equity requires it.

Finally, if the Court nonetheless decides to enter party-specific preliminary relief, it should at minimum extend relief to all of the trade association plaintiffs and their members. As we demonstrated (Opening Br. 23), extending relief to the members of trade association plaintiffs is common in cases like this. In addition to the cases cited in the opening brief, see, for example, *Texas v. Becerra*, 89 F.4th 529, 546 (5th Cir. 2024) ("defendants may not enforce the Guidance . . . against AAPLOG's members and CMDA's members"), and *NRA v. ATF*, 2024 WL 1349307, at *11 (N.D. Tex. 2024) (preliminarily enjoining the federal defendants from "enforcing the Final Rule against the NRA's members pending the final resolution of this action on the merits").

DOL's only response is to imply that any preliminary relief should be limited to the declarants whose testimony has established irreparable harm—a position it supports (again) with citations to non-APA cases. But DOL does not dispute that plaintiffs have properly demonstrated their associational standing or that, in a final judgment, they *and their members* (at least) would be entitled to relief. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (a trade association may "seek[] a preliminary injunction on behalf of its members" if it has shown that it "has associational standing to bring its case on the merits"). Nor does DOL ultimately dispute that "the scope of [any] preliminary relief" should "align[] with the scope of ultimate relief under Section 706." *Career Colleges*, 98 F.4th at 255. Thus, the Court must at least extend injunctive relief to plaintiffs and their members.

DOL's final argument is to say that the offending portions of the Rule should be severed, rather than staying (or ultimately vacating) the entire Rule. Plaintiffs do not dispute that point. They seek a stay, in particular, a stay of the Rule's amendment of 20 C.F.R. § 655.135.

**CONCLUSION**

The Court should enter a Section 705 stay before the end of November to extend for the duration of judicial review, including any appellate proceedings before the Fifth Circuit or Supreme Court. Alternatively, it should enter an order temporarily enjoining defendants from enforcing or implementing the Rule as against the plaintiffs and their members.

Dated: November 14, 2024

Respectfully submitted,

/s/ *M. Brant Pettis*

Michael B. Wallace (MS Bar No. 6904)
Wise Carter Child & Caraway, P.A.
401 E. Capitol Street (39201)
Post Office Box 651
Jackson, MS 39205-0651
601-968-5534
mbw@wisecarter.com

James C. Simpson, Jr. (MS Bar No. 6810)
Wise Carter Child & Caraway, P.A.
2510 14th Street, Suite 1125
Gulfport, MS 39501
228-867-7141
jcs@wisecarter.com

*Counsel for Mississippi Farm Bureau*
*Federation and Stone County Farm Bureau*

Jennifer B. Dickey (*pro hac vice*)
Mariel A. Brookins (*pro hac vice*)
CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA
615 H Street, N.W.
Washington, D.C. 20062
(202) 659-6000
mbrookins@USChamber.com

*Counsel for Chamber of Commerce of the United*
*States of America*

Michael B. Kimberly (*pro hac vice*)
Paul W. Hughes (*pro hac vice*)
Connor J. Suozzo (*pro hac vice*)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
(202) 756-8901
mkimberly@mwe.com

Jonathan P. Dyal (MS Bar No. 99146)
M. Brant Pettis (MS Bar No. 101976)
Alison G. Geter (MS Bar No. 105939)
Balch & Bingham LLP
1310 25th Avenue
Gulfport, MS 39501
(228) 864-9900
jdyal@balch.com
bpettis@balch.com
ageter@balch.com

*Counsel for all Private Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing pleading or other paper with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 14th day of November, 2024.

/s/ *M. Brant Pettis*
Of Counsel